**William A. FENSTERER, Defendant Below-Appellant,**

v.

**STATE of Delaware, Plaintiff Below-Appellee.**

Supreme Court of Delaware.

Submitted: Feb. 19, 1985.

Decided: May 1, 1985.

Harold Schmittinger and Charles White-hurst of Schmittinger & Rodriguez, P.A., Dover, for defendant below-appellant.

John A. Parkins, Chief of Appeals Div., Timothy J. Donovan, Deputy Atty. Gen., Wilmington, and Gary A. Myers, Deputy Atty. Gen., Georgetown, for plaintiff below-appellee.

Before McNEILLY, HORSEY and CHRISTIE, JJ.

McNEILLY, Justice:

On Tuesday morning, September 29, 1981, the body of Stephanie Ann Swift was found in a blue Camaro in the parking lot of the Milford Plaza Shopping Center. She was the victim of an apparent strangulation. On November 2, 1981, Stephanie's fiancé, William A. Fensterer, was arrested and charged with Murder in the First Degree.

The State's case against Fensterer was based upon circumstantial evidence. The jury found Fensterer guilty of the lesser included offense of Murder in the Second Degree. He appeals to this Court for relief from his conviction.

I

The facts of this case, consisting of events preceding the death of Stephanie Ann Swift, the subsequent investigation of her death, and the proceedings against Fensterer, are voluminous. We summarize the facts in a manner sufficient to give a background to the case, then discuss other factual happenings as we analyze the various issues raised on this appeal.

William A. Fensterer was a twenty-three year old bookkeeper-accountant working at an agriculture products establishment in Milford, Delaware, known as The Reeds, Inc. He began dating Stephanie Ann Swift on a regular basis and by June of 1981, they were living together at 715 Parson Thorne Apartments in Milford. They became engaged to be married. Stephanie was a seventeen year old high school student at Indian River High School. She

previously had dropped out of high school, but after meeting Fensterer, she resumed school and was commuting from their Milford apartment to complete her senior year. Stephanie commuted with Fensterer's blue Camaro, and Fensterer used her black Cougar since the Cougar was not in appropriate mechanical condition to be driven the distance to the high school.

Three days before Stephanie's murder, on Friday, September 25, 1981, Fensterer and Stephanie embarked on a weekend trip to Atlantic City. The couple left their pets at Stephanie's parents' home in Possum Point, near Millsboro, Delaware. The couple went on the trip with Mrs. Shellar, Stephanie's grandmother. The relationship between the couple over the weekend is subject to dispute. Mrs. Shellar testified that Fensterer had mentioned a former boyfriend of Stephanie's, John King, and that he was afraid Stephanie was seeing King again. Mrs. Shellar testified that thereafter the relationship between Fensterer and Stephanie became strained. In contrast, Fensterer testified that neither their relationship nor the weekend were strained. It is uncontroverted that after the trip Fensterer and Stephanie returned to their Milford apartment at approximately 6:00 p.m. on Sunday. That night, Fensterer did some laundry and cooked dinner while his fiancée worked on a report for school.

The following day, Monday, September 28, 1981, Stephanie Ann Swift was murdered. The events of that day began with Stephanie and Fensterer having sexual relations that morning before Fensterer went to work at approximately 8:00 a.m. Fensterer, as usual, drove Stephanie's black Cougar, leaving Stephanie his blue Camaro. Fensterer and his co-workers testified that he remained at work until approximately 12:30 p.m. when Stephanie met him at work for lunch. Although, Lee Shepard, the manager of their apartment complex, testified that between 10:00 a.m. and 12:00 noon, he saw the Cougar in the Milford apartment parking lot. Regardless, it is uncontested that at 12:30 p.m. Fensterer and Stephanie went to the bank, then to Pasquales Restaurant for lunch, and then returned Fensterer to work at approximately 1:30 p.m. The couple was seen at Pasquales by witnesses who testified that the couple seemed to be happy and were holding hands upon leaving the restaurant. After returning Fensterer to work, Stephanie went shopping. The last person to see Stephanie alive was a sales lady in The Dollar General Store, around 2:00 that afternoon.

It is uncontested that Fensterer worked until around 4:55 afternoon. Upon leaving work he drove back to their apartment and discovered that Stephanie was not there. He waited until 5:42 p.m. and then called Stephanie's parents, the Swifts, and asked if anyone had seen Stephanie. He looked through Stephanie's dresser drawers and found some old letters from Stephanie's past boyfriends. He then wrote Stephanie a note chastising her for not picking up their pets they left at her parents while on their Atlantic City trip. The note read:

Steph,

If and when you deside [sic] to come home, I think it would be in your best interest to keep your ass in the house. I've waited for an hour and a half for you! I thought you were supposed to pick up the animals at 5:00!! Where the f..k are you! I'm worried to death about you, but also so f.....g p....d off! Were's your respensibility [sic] girl!

Bill

I went to pick up the animals.

What happened the remainder of the evening remains in dispute. We do know that sometime that evening Fensterer made a one hour round trip to the Swifts (approximately 56 miles) and picked up the couple's pets and that at 8:13 that evening, sometime after returning from the Swifts, he called the Swifts to see if they had yet to hear from Stephanie.

The State contends that the events of that evening began with Fensterer going to the Swifts' home at around 6:15 or 6:20

p.m.; that he returned to the Milford apartment between 7:00 and 8:13 p.m. Upon returning to the apartment, the State contends that a jealous Fensterer strangled his fiancée with their blue cat leash. The State contends that Fensterer carried Stephanie's body out of the apartment, put her in the Camaro, and abandoned her with the Camaro in the Milford Plaza Shopping Center parking lot.

On the other hand, the defense presents a different version of the events of that Monday evening. Fensterer contends that he did not leave Milford until around 6:30 that night; that he arrived at the Swifts around 7:15 p.m. and that it was around 8:00 p.m. when he returned to the apartment.

Witnesses for the State and defense dispute the time of Stephanie's death. Dr. Judith Tobin, Assistant State Medical Examiner, testified at trial, after giving several different prior conclusions as to the time of Stephanie's death, that it was her then current belief that Stephanie had died between 2:00 p.m. and 10:00 p.m. on September 28, 1981, but more probably between 3:30 p.m. and 8:00 p.m.[1] The defense witness, Dr. Cyril Wecht, a certified forensic pathologist and professor at the University of Pittsburgh School of Medicine, Duquesne University and Pittsburgh School of

Dentistry, testified that Stephanie had died around 4:00 p.m. on September 28th.

We do know that the next day, Tuesday, September 29, 1981, Fensterer went to the Milford Police Department to file a missing person's report on Stephanie. At 9:43 a.m., the body of Stephanie Ann Swift was found in the Milford Plaza Shopping Center. Next to the Camaro she had driven, was a brown cord approximately 25 inches in length. There was a black hair on Stephanie's leg that blew away before police could save it.[2] The blue cat leash, the alleged murder weapon, was found in the couple's apartment.

## II

We first address Fensterer's contention which we believe is meritorious and upon which ground we reverse his conviction. Fensterer's contention is that testimony of Special Agent Allen Robillard of the Federal Bureau of Investigation, was inadmissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[3]

### A.

The State sought to prove by circumstantial evidence that the blue cat leash found in the couple's apartment was the murder weapon. The State sought to establish that two hairs found on the leash bore

---

1. Dr. Judith Tobin gave several different estimated times of death. Detective Michael Tigue of the Delaware State Police, who assisted the Milford Police Department in the investigation, testified that Dr. Tobin told him on September 29, 1981 that the time of death was between 6:00 p.m. and 7:00 p.m. Dr. Tobin issued the first death certificate on September 30, 1981, listing the probable time of death as between 8:00 p.m. and 12 midnight. On the second certificate issued on November 9, 1981, Dr. Tobin listed the time of death as between 2:00 p.m. and 10:00 p.m. Also Detective Bogdon, the principle investigating officer of the Milford Police Department, testified that Dr. Tobin told him prior to the preliminary hearing that the time of death was between 3:30 p.m. and 7:30 p.m.

2. Fensterer asserted that this was significant since Stephanie's hair was blond and his hair is brown.

3. In addition to the Confrontation Clause argument, Fensterer contends that Special Agent Robillard's testimony was inadmissible under Delaware Rule of Evidence 705 and under *Frye v. United States*, D.C.Cir., 293 Fed. 1013 (1923). We do not address these contentions due to our reversal on Confrontation Clause grounds.

We do note, however, our rejection of the *Frye* test as an independent controlling standard of admissibility, in *Whalen v. State*, Del.Supr., 434 A.2d 1346 (1980), cert. denied 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). The pertinent Delaware Rules of Evidence regarding admission of scientific testimony are Delaware Rules of Evidence 402, 702, and 403. *See State v. Williams*, Me.Supr., 388 A.2d 500 (1978), *U.S. v. Downing*, 3rd Cir., 753 F.2d 1224, 1237 (1985).

similar characteristics to Stephanie's hair. In addition, the State sought to establish that one of the hairs on the leash was forcibly removed from the victim, thereby implying to the jury that one of the hairs had been pulled out during the strangulation of the victim. The State sought to prove its theories by the testimony of Special Agent Allen Robillard.

Agent Robillard testified that one of the hairs found on the leash had been forcibly removed from the head. He explained that there were three theories upon which a determination could be made that hair had been forcibly removed. The theories were: (1) The presence of the follicular tag on the hair, (2) the presence of an elongated and misshaped root, and (3) the presence of a sheath of skin surrounding the root area. As to which theory he relied upon in coming to his conclusion, the following colloquy transpired at voir dire:

A. Let me step back one step with regard to the presence of the follicular tag. That is one of the ways that I am able to determine hair is forcibly removed. There are two other possible ways.

As to the exact manner in which this particular hair was forcibly removed, I don't know. I have no indication in my notes other than the fact it was forcibly removed.

So to answer your question about the follicular tag, yes, that is possible that it was there.

Q. You have no indication in your notes how you determined that this hair was forcibly removed?

A. Other than the fact it was forcibly removed, that's true. I have no indication. I do have personal knowledge that it was based on one of the three characteristics.

Q. One of the three characteristics. Do you remember which one it was?

A. No, sir, I don't.

Again, in his direct examination testimony Agent Robillard stated: "I have reviewed my notes, and I have no specific knowledge as to the particular way that I determined the hair was forcibly removed other than the fact that one of those hairs was forcibly removed". Agent Robillard displayed the same lack of knowledge, as to the basis for his conclusion, when cross-examined by defense counsel.

### B.

While Fensterer contends that Agent Robillard's testimony denied him his rights under the Confrontation Clause [4], the State contends that the defense had a strong indication that Agent Robillard had relied upon the presence of a follicular tag to reach his conclusion. Moreover, the State contends, Fensterer was not denied effective cross-examination since defense counsel did try to discredit the follicular tag theory.

The Sixth Amendment guarantees the right of the accused to be confronted with the witnesses against him. Confrontation means more than being allowed to confront the witnesses physically. The primary interest secured by the Clause is the right of cross-examination. *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), *Ward v. State*, Del. Supr., 395 A.2d 367 (1978). Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The government has a serious obligation not to obstruct a criminal defendant's cross-examination of expert testimony. *United States v. Dioguardi*, 2nd Cir., 428 F.2d 1033, 1038, cert. denied, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54 (1970), *United States v. Kelly*, 2nd Cir., 420 F.2d 26, 29 (1969).

**4.** The United States Constitution provides in relevant part:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ..."
U.S. Const. amend VI.

■ In the case at bar, the State is correct in one respect. Fensterer's attorney conducted a cross-examination of Agent Robillard, focusing upon the discrediting of the follicular tag theory. The defense presented its expert witness Dr. Peter DeForest of Hartsdale, New York. Dr. DeForest testified that scientific authority contradicted the Agent's theory that the presence of a follicular tag indicated the hair had been forcibly removed.

Nonetheless, we are unable to accept the State's argument that Fensterer's counsel was able to conduct an adequate cross-examination of Agent Robillard. A Special Agent from the Federal Bureau of Investigation can appear to be a highly credible person to the average lay jury. Effective cross-examination and discrediting of Agent Robillard's opinion at a minimum required that he commit himself to the basis of his opinion.[5] Without an acknowledgment of the basis of his opinion, defense counsel's cross-examination of the Agent was nothing more than an exercise in futility.

A matter which is highly material deserves extensive cross-examination. *Skinner v. Cardwell*, 9th Cir., 564 F.2d 1381, 1389, (1977) cert. denied, 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978). Agent Robillard's conclusion that a hair on the leash was forcibly removed was a highly material issue in this case. The conclusion showed that at least one hair on the leash was from the strangulation, and thereby established the leash as the murder weapon. The leash belonged to Fensterer and Stephanie.

Moreover, we cannot rule out the possibility that had Agent Robillard committed himself to the theory upon which he rested

his conclusion, he could have been completely discredited. A complete discrediting of the Agent's testimony that one hair was forcibly removed would have reflected poorly on the accuracy of the Agent's other testimony, including his testimony on the identification of the two hairs on the leash as Stephanie's.

In sum, although we cannot say for sure what would have happened if Agent Robillard disclosed the scientific theory upon which he relied, we do know that without such a disclosure, Fensterer was denied his right to effectively cross-examine a key state witness. We have no choice but to reverse Fensterer's conviction. For us to do anything else would pervert the right of a person to confront the witnesses against him in a criminal trial.

### III

■ Notwithstanding the fact that we reverse and remand Fensterer's conviction on Confrontation Clause grounds, the more favorable remedy accorded a reversal upon speedy trial grounds compels us to delineate our rejection of that contention of Fensterer.

Fensterer contends that he was denied his right to a speedy trial under the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Constitution of the State of Delaware.[6] He contends that the twenty-six month delay from November 2, 1981, the date of his arrest, to January 9, 1984, the date of his trial, denied him a speedy trial.

■ A defendant has no greater right to a speedy trial under Article I, Section 7 of the Delaware Constitution than he has under the Sixth Amendment to the United States Constitution. Therefore, our analy-

---

5. Dr. DeForest's testimony that sometime before trial Agent Robillard told him that he (Robillard) relied upon the follicular tag theory, is not the equivalent of Agent Robillard acknowledging the theory upon which he relied.

6. The United States and Delaware Constitutions provide in relevant part:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ..."

U.S. Const. amend. VI. Article I, section 7 of the Delaware Constitution, using similar language, says:

"In all criminal prosecutions, the accused hath a right ... to have ... a speedy and public trial ..."

sis of Fensterer's state constitutional challenge parallels that of his federal claim.[7] *See Shockley v. State,* Del.Supr., 269 A.2d 778 (1970) (state speedy trial right interpreted in light of federal precedents).

■ What constitutes a speedy trial is variable, depending upon the facts of the individual case. *Stacey v. Delaware,* Del. Supr., 364 A.2d 819, 820 (1976) (citing *Beebe v. State,* Del.Supr., 346 A.2d 169 (1975)). To determine whether a speedy trial violation has occurred, the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set forth a balancing test in which the conduct of both the prosecution and defendant are weighed. The Court identified some of the factors to be weighed as: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id., Stacey v. Delaware, supra, State v. Morris,* Del.Super., 340 A.2d 846, *affirmed,* Del.Supr., 349 A.2d 748 (1975). We proceed then, to consider the factors enumerated in *Barker,* seriatim.

### Length of delay

As to this first factor, the United States Supreme Court said "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry in the other factors that go into the balance." *Barker* 92 S.Ct. at 2192.

Here, the State concedes that the 26 month delay is not so brief so as to preclude inquiry into the remaining *Barker* factors. Indeed, at face value, a delay of twenty-six months causes us concern. Thus, the *Barker* test is triggered, and we proceed with a weighing of the factors.

### The reason for the delay

Fensterer contends that the prosecution engaged in "foot dragging" and intention-

ally delayed his trial. The State contends that the delay was caused by the defense's piecemeal discovery and crowded court dockets.

■ A deliberate attempt to delay trial in order to hamper the defense will be weighed heavily against the State, while a more neutral reason such as negligence or overcrowded courts will be weighed less heavily. *Barker* at 2192. On the other hand, delay caused by the defendant's own actions cannot be weighed against the State. *Key v. State,* Del.Supr., 463 A.2d 633, 637 (1983), *Brown v. Slayton,* W.D. Va., 342 F.Supp. 61 (1972), *See United States v. McGrath,* 2nd Cir., 622 F.2d 36, 41 (1980).

Upon a thorough review of the record, there is no evidence of bad faith or deliberate delays on the part of the prosecution. In contrast, the more obvious reason for the delay was Fensterer's own piecemeal discovery and his motions. A review of the docket entries reveals numerous discovery requests and motions filed by the defense:

December 7, 1981 Motion for Discovery

January 26, 1982 Supplemental Motion for Discovery

February 16, 1982 Motion to Suppress (hearing held January, 1983 and decided March, 1983)

February 17, 1982 Motion to Inspect Grand Jury Testimony

May 10, 1982 *Brady* Motion

June 3, 1982 Bill of Particulars

September 9, 1982 Supplemental Request for Discovery

March 17, 1983 Second *Brady* Motion (involved briefing; order issued September, 1983)

The necessity for briefing and oral argument on some of Fensterer's motions cannot be weighed against the State. The State is not expected to surrender its meri-

---

7. The only difference in determining Fensterer's rights under Article I, Section 7 of the Delaware Constitution is that his own actions weigh more heavily against him. *Key v. State,* Del.Supr., 463 A.2d 633, 638 (1983). In light of our analysis herein, Fensterer suffered no violation of his state speedy trial right.

torious legal arguments so that a defendant may be brought to trial more quickly.

Overall, the only delay that can be reasonably attributed to the State is about 6 months of the delay to hear Fensterer's Suppression Motion due to congested Court dockets, and possibly a month or so of delay caused by sluggish responses to discovery requests. We conclude that the rest of the twenty-six month delay can be directly attributed to Fensterer's piecemeal discovery and motions. By electing to file motions raising preliminary legal questions Fensterer cannot now reasonably argue that the State delayed his trial.

Summarizing the first two of our four relevant factors, this case was one of delay which causes us concern, but the delay was caused primarily by Fensterer's own elections.

### Defendant's assertion of his right

■ Fensterer filed motions to dismiss premised upon speedy trial grounds on November 30, 1982 and on January 5, 1984. Both motions were denied. The State contends that a motion to dismiss is not a demand for a speedy trial, and, therefore, Fensterer has failed to assert his right. Such an argument is preposterous.

The State's reliance upon *Barker v. Wingo, supra,* and *Latson v. State,* Del.Supr., 146 A.2d 597 (1958) is misplaced. In both cases the motions to dismiss filed by the defense did not state speedy trial as the ground for dismissal. Here, Fensterer's motions were explicitly premised upon his right to a speedy trial.

Certainly, Fensterer has asserted his speedy trial rights throughout the course of his prosecution.

### Prejudice to the defendant

This fourth and last factor we conclude, weighs against Fensterer. The *Barker* Court explained that prejudice "should be assessed in light of the interests of defendants which the speedy trial right was de-

signed to protect." *Id.* 92 S.Ct. at 2193. The Court continued that the interests were: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*

As to the first interest, Fensterer has no argument that he suffered "oppressive pretrial incarceration" since he was free on bail shortly after his arrest.

The second interest, the anxiety of the accused, is to some extent present in any case. There is no reason to believe that Fensterer suffered any more anxiety than any other person charged with first degree murder.

The last interest is actual prejudice to the defense's case. There was no prejudice to Fensterer's case caused by the delay in trial. All his witnesses were still available at trial time.

Fensterer contends he was prejudiced by three key witnesses all changing their testimony since the date of arrest. But at least one of the three witnesses, Dr. Judith Tobin, began changing her testimony the day after Stephanie's body was found.[8] Moreover, the three witnesses were prosecution witnesses. The various versions of their testimony was prejudicial to the State since defense counsel was effectively able to impeach them on the inconsistencies.

In addition, Fensterer contends he was prejudiced by Agent Robillard's inability to recall which one of the theories he relied upon to come to his conclusion that hair on the cat leash was forcibly removed from the head. The prejudice suffered by Fensterer which resulted from the Agent's testimony was caused by the error of the Trial Court in admitting the testimony; not caused by the delay in trial. As we explained earlier, Agent Robillard's testimony was inadmissible under the Confrontation Clause. If his testimony had been properly excluded, Fensterer would not have been prejudiced.

---

8. *See* note 1 *supra.*

To sum up the prejudice factor, with no pre-trial incarceration, no more than normal anxiety and little impairment of the ability of the defense to present its case, this factor weighs in favor of the State.

After our examination of the above factors we balance and weigh them for a determination of whether a speedy trial violation has occurred. We conclude that the balance tips against Fensterer. What tips the scale in that direction are the reasons for the delay, Fensterer's time consuming motions and piecemeal discovery, as well as the absence of demonstrable and appreciable prejudice to Fensterer's ability to present his defense.

### IV

■ Fensterer also contends that the Trial Court abused its discretion in failing to sequester the jury, and that he was denied a fair trial by improper comments made by the prosecutor during closing argument. In light of our reversal on Confrontation Clause grounds, we do not address these issues. We do address briefly Fensterer's contention that the Trial Judge abused his discretion by giving a second "*Allen*-type" charge where the jury did not request a rereading of the charge.[9]

The first "*Allen*-type" charge was given on Thursday, February 2, after the jury had deliberated approximately four hours and reported itself deadlocked. The Trial Judge gave the charge from memory. The jury deliberated on Friday and then adjourned for a three-day holiday weekend. The jury returned on Tuesday, February 7, and was immediately given a complete second "*Allen*-type" charge. The jury deliberated four hours and reached its verdict.

In *Brown v. State,* Del.Supr., 369 A.2d 682 (1976), this Court recognized that a supplementary instruction referred to as an "*Allen*-type" charge or "dynamite charge" is generally proper to encourage a jury to reach a verdict, but we cautioned:

> However, a trial judge may not coerce the jury into reaching a verdict and, for that reason, any such charge must be carefully examined to determine its total effect on the jury in reaching a verdict.

*Brown* at 684. *Hyman Reiver & Co. v. Rose,* Del.Supr., 147 A.2d 500 (1958).

Upon consideration of all the circumstances in this case, we do not believe the giving of two "*Allen*-type" charges was coercive. Both charges contained the admonition referred to in *Brown v. State.*[10] Also, the fact that the jury deliberated four hours after the second charge is an indication that the charge itself was not coercive. Furthermore, along with the giving of the second "*Allen*-type" charge, the jury was told, as requested by defense counsel, that it need not deliberate an unreasonable length of time before being discharged. These factors lead us to conclude that the "*Allen*-type" charges, in this case, did not have a coercive effect on the jury.

■ Although we do not embrace Fensterer's contention that a reading of a second "*Allen*-type" charge is per se reversible error, Trial Courts should heed our advice that multiple "*Allen*-type" charges be avoided. *Britt v. State,* Del.Supr., 402 A.2d 808, 810 (1979).

\* \* \*

REVERSED and REMANDED for proceedings consistent herewith.

---

9. *See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

10. The admonition referred to in *Brown* is that "each individual juror not surrender his or her honest convictions and not to return any verdict contrary to the dictates of personal conscience." *Brown* at 684. The February 2nd instruction contained three such admonitions and the February 7th instruction contained two such admonitions.