**James NELSON, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: April 20, 1993.
Decided: July 29, 1993.
As Revised July 30, 1993.

Eugene J. Maurer, Jr. (argued), Wilmington, for appellant.

Richard E. Fairbanks, Jr., Chief of Appeals Div., Dept. of Justice (argued), Wilmington, William N. Nicholas, former Deputy Atty. Gen., and James A. Rambo, Deputy Atty. Gen., Dover, for appellee.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

In this case we consider for the first time the admissibility of evidence arising from the scientific technique of deoxyribonucleic acid (DNA) typing in criminal prosecutions. The appellant, James Nelson ("Nelson"), appeals his Superior Court jury convictions of Robbery First Degree, Kidnapping First Degree and Unlawful Sexual Intercourse First Degree. Nelson contends that the Superior Court erred in admitting the State's evidence that a DNA sample obtained from Nelson's blood matched DNA samples taken from semen stains found on the victim. We find the trial court to have committed error by admitting evidence of the DNA match while excluding evidence of the reliability of the match. Nevertheless, we find the error to be harmless in light of the overwhelming evidence of record to support the convictions. Therefore, we affirm.

## I. FACTS

About 6:00 a.m. on August 29, 1989, the victim, a Dover resident on her way to work by car, stopped to obtain cash at a Dover bank's automated teller machine. As she was placing her bank card in the machine, an unknown male came up from behind and grabbed victim around the neck. Victim could not see her assailant's face, and saw only a black arm coming around her head. When victim struggled, her assailant applied a choke hold, causing painful injury to her neck and vertebrae. In the struggle, victim's glasses were intentionally taken or knocked off, without which she could not see. Threatening to kill her if she screamed, her assailant forced victim back into her car with him and he drove off. When victim repeatedly asked her assailant what he was going to do, he said nothing, other than referring to her a "white rich bitch." He then told her to take her clothes off as he drove out of town. When assailant reached a desolate location, he stopped the car and vaginally raped victim. He then allowed victim to dress and drove her back to Dover, stopping the car in an alley. Before getting out, assailant wiped his fingerprints from the car and took all of victim's rings and money.

Disoriented, barefooted and nearly unable to see without her glasses, victim was able to drive back to the bank teller machine where she found her glasses. Victim then went to the Dover police station, arriving at about 7:00 a.m. She told the police of what had happened. When asked to identify her assailant, victim would only tell police officer Flicker that he was a black male.

Flicker was aware that the bank's automated teller was equipped with a surveillance camera and the bank permitted Flicker and a fellow officer to view the videotaping of that morning at 6:00 a.m. The tap-

ing had recorded victim's seizure and abduction and the features of her assailant. Officer Flicker realized he had seen victim's assailant before but could not recall his name. When Flicker later the same day showed the film to a federal marshall and former officer of the Dover Police Department, Reginald Capitan, Capitan immediately identified Nelson as victim's assailant. A warrant was then issued for Nelson's arrest; and he was taken into custody at his Dover residence later the same day.

When Nelson was arrested the police found a black onyx ring and wedding band in his pocket. Victim subsequently identified these rings as the ones taken from her by her assailant. In addition, a pubic hair discovered on Nelson's jeans was analyzed and determined to have characteristics consistent with victim's pubic hair. Finally, a DNA analysis conducted by the Federal Bureau of Investigation (FBI) revealed that the DNA sample obtained from Nelson's blood matched those samples taken from the semen stain on victim's panties and vaginal smears. Thereafter, Nelson was indicted for first degree robbery, kidnapping and unlawful sexual intercourse.

## II. PROCEEDINGS BELOW

Before trial in December 1990, defendant, by motion *in limine*, sought to exclude at trial the State's evidence of DNA match and the reliability of the match, *i.e.*, the statistical probability of finding such a match (of defendant's semen sample taken from victim's underpants) from an unrelated member of the black population. The State offered evidence: that the DNA extracted from Nelson's blood matched the DNA extracted from the semen stain on the victim's panties and vaginal smears; and that the probability of another member of the Afro–American population having DNA test results which matched Nelson's was one in six million. The State's witness

was Dr. Bruce Budowle, an FBI research scientist responsible for the development of the agency's DNA testing program. The defense did not present any expert witnesses; and the record discloses no application by defendant for the employment of a DNA expert at State expense.

Following the hearing, the Superior Court ruled that it would admit at trial the State's evidence of a DNA match but would exclude the State's evidence as to the probability of such a match occurring in a random population.[1] The court reasoned:

This Court has weighed carefully the probative value of this evidence (high) and the potential prejudice to the defendant (high) as well as the danger of confusion to the jury (high). This Court concludes that based upon the evidence heard, the FBI must be allowed to testify as to its opinion of a match. The Court is also convinced that under the specific facts of this case, the statistical probabilities of a random unrelated match should be excluded. This Court is especially concerned in this case that the jury could easily be confused by statistics that are as testified "an estimate" of the occurrence of certain DNA characteristics in the black population. This is especially true where because of indigency, the defendant has been unable to engage scientific expertise to challenge this testimony. The reliability of these calculations should be left to a trial where in the Court has scientific evidence presented on both sides of the issue. *See State v. Pennell, supra;* and *People v. Castro* [144 Misc.2d 956] 545 N.Y.S.[2d] 985 (1989).

At trial the only issue was the identity of victim's assailant. There was no dispute that she had been kidnapped, raped and robbed. The question was whether defendant was her assailant. Before trial, victim had been unable to identify her assailant

---

1. Pursuant to 10 *Del.C.* § 9903, the State sought to appeal the Superior Court's decision to exclude the statistical probability evidence related to the DNA match proffered by the State. We denied the State's application. We concluded that the trial court's ruling had "limited, if any, precedential value," and that "the evidentiary ruling ... was an exercise of the Superior Court's discretion [which] was directly related to the specific facts of the case before it." *See State v. Nelson,* Del.Supr., 608 A.2d 730 (1991) (Order).

other than to say that he was a black male; and she had also been unable to identify the defendant in a show-up conducted by the police following defendant's arrest.

At trial the State offered the following evidence to establish that Nelson was victim's assailant: (1) the videotape of the bank surveillance camera which recorded the initial assault and her assailant's face, which several police witnesses identified from the videotape as being Nelson; (2) the two rings which victim had been wearing at the time of the assault and which were found on Nelson's person at the time of his arrest; (3) Nelson's jeans seized at his arrest and the finding of an FBI hair expert of pubic hair on Nelson's jeans, which was microscopically consistent with victim's; and (4) expert analysis of the assailant's semen, obtained from vaginal smears and from victim's panties, finding both to match a sample of DNA obtained from Nelson's blood.

The State's first three evidentiary offerings were admitted without objection by defendant. Defendant objected only to the State's proffer of the its DNA evidence. Confirming its pretrial ruling, the court admitted the State's evidence of DNA match but excluded the State's evidence of statistical probability. Defendant offered no evidence at trial. The jury found Nelson guilty of all charges and following sentence Nelson appealed.

### III. ISSUES ON APPEAL

On appeal, Nelson contests only the court's admission of the DNA match evidence, asserting two arguments. Nelson first argues that, since the FBI's scientific procedures of DNA typing are "still emerging" and have several asserted deficiencies, the DNA matching evidence should have been barred as inadmissible under *Frye v. United States*, D.C.Cir., 293 F. 1013 (1923). Secondly, Nelson contends that the trial court erred in admitting the determined match between the DNA of Nelson and

victim's assailant after declining to admit the State's corresponding statistical probability that the found match may have occurred by chance—one in six million. Notably, Nelson neither attacks the admissibility of the State's other evidence nor contests the sufficiency of that evidence, standing alone, to sustain his convictions.

The State denies that the trial court committed legal error in declining to apply the *Frye* "general acceptance" test. The State argues that DNA identification evidence is "plainly admissible" under both the Delaware Rules of Evidence and Delaware case precedent holding that *Frye* is no longer the standard under which the admissibility of scientific evidence is analyzed in Delaware.

In seeking to sustain the trial court's admission of the State's matching evidence but exclusion of its statistical evidence, the State makes three arguments. First the State contends that, defendant having failed at trial to challenge the court's admission of the match evidence on the grounds now asserted, the argument is barred on appeal under Supreme Court Rule 8;[2] and plain error is not a basis for reversal because defendant made a tactical decision not to engage a counter-expert. The State also argues that the trial court's exclusion of the State's statistical evidence, though "doubtful," was not legal error. The State asserts that the trial court's ruling "was narrowly tailored to the unique circumstances of this case" and to a conscious, tactical decision of the Public Defender not to contest the State's expert testimony. Alternatively, the State contends that the statistics are not the *"sine qua non* of the admissibility of the match," arguing that they go to the weight, not the admissibility, of the match evidence.

### IV. STANDARD FOR THE ADMISSIBILITY OF EXPERT SCIENTIFIC EVIDENCE

A much-debated evidentiary question is the proper standard for determining the

---

**2.** Supreme Court Rule 8 provides:

**Rule 8. Questions Which May Be Raised on Appeal**

Only questions fairly presented to the trial court may be presented for review; provided,

however, that when the interests of justice so require, the Court may consider and determine any *question not so presented.*

admissibility of new or novel scientific evidence. The admissibility of DNA typing evidence is one of the most prominent areas of debate. Nelson argues that the Superior Court erred in failing to apply the standard articulated in *Frye, supra,* or a variation of that test, to determine whether the State's DNA typing results were admissible. The State counters that *Frye* is no longer the rule in Delaware and that the analysis of the evidence undertaken by the Superior Court is consistent with the Delaware Rules of Evidence.

When faced with a question that requires the determination of the admissibility of novel scientific evidence, many, though not all, jurisdictions in the past have adopted the standard expounded in *Frye. See, e.g., United States v. Jakobetz,* 2nd Cir., 955 F.2d 786, 794, *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Under this standard, the admissibility of scientific evidence hinges upon whether the scientific technique has been "sufficiently established to have gained *general acceptance* in the particular field in which it belongs." *Frye,* 293 F. at 1014 (emphasis added). The underlying assumption of the *Frye* standard is that "general acceptance" indicates reliability and that only reliable evidence should be admissible. *See Jakobetz,* 955 F.2d at 794.

▪ The codified Delaware Rules of Evidence ("D.R.E.") became effective July 1, 1980. Before and since the codification of these rules we have held that the general acceptance test of *Frye* is not the sole criteria for assessing the admissibility of scientific test results or evidence. *See Santiago v. State,* Del.Supr., 510 A.2d 488, 489 (1986) (*Frye* not "sole test" for judging admissibility); *Fensterer v. State,* Del. Supr., 493 A.2d 959, 962 n. 3 (1985) (rejects *Frye* as "independent controlling standard of admissibility"), *rev'd on other grounds,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15

(1985);[3] *Whalen v. State,* Del.Supr., 434 A.2d 1346, 1354–55 (1981) (*Frye* not "only criteria" employed to assess admissibility), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). The State contends that, under this Delaware precedent, the trial court's failure to apply the *Frye* test was not error. We agree.

The United States Supreme Court recently reconsidered *Frye* and its standard for admitting expert scientific testimony in a federal trial. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *vacating* 951 F.2d 1128 (9th Cir.1991). *Daubert* involved the admissibility of expert testimony regarding the correlation between the ingestion of the drug Bendectin by a pregnant woman and serious birth defects of the child born following that pregnancy. The Court found the *Frye* standard to be superseded by the adoption of the Federal Rules of Evidence and ruled that the admissibility of expert scientific testimony at federal trials is governed by Federal Rule of Evidence 702 ("FRE 702").[4] *Id.* —— U.S. at 2794, 113 S.Ct. at ——. The Court also found nothing in the text of FRE 702 to require the "general acceptance" standard articulated in *Frye* to be an absolute prerequisite to admissibility. *Id.*

Our decisions in *Santiago, Whalen* and *Fensterer* are consistent with the Supreme Court's decision in *Daubert.* Most recently, we stated that for an expert to testify as to his or her opinion based upon the results of a test he or she performed, the expert must establish that the test is "reasonably relied upon by experts in the field." *Santiago,* 510 A.2d at 490 (citing D.R.E. 703). Beyond our reliance upon D.R.E. 703, as in *Santiago,* we have found other rules of evidence pertinent to determining whether scientific evidence should

---

3. This Court reaffirmed its position regarding *Frye* when *Fensterer* was returned from the Supreme Court. *See Fensterer v. State,* Del.Supr., 509 A.2d 1106, 1109 n. 1 (1986).

4. Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

be admissible.[5] Thus, in Delaware, scientific evidence, rather than being governed by *Frye,* must satisfy the pertinent Delaware Rules of Evidence concerning the admission of scientific testimony or evidence. *See Fensterer,* 493 A.2d at 962 n. 3; *Whalen,* 434 A.2d at 1354 (scientific evidence admissible because it satisfied admissibility, relevance and reliability requirements).

■ For scientific evidence or testimony to be admissible under the Federal Rules of Evidence, a trial court must also find the evidence sought to be admitted relevant and reliable. *Daubert,* — U.S. at —, 113 S.Ct. at 2794.[6] The Delaware Rules of Evidence are no different.[7]

■ Turning to this case, we find the Superior Court's analysis of the DNA typing evidence to comply with the Delaware Rules of Evidence. The Superior Court applied a five-step test invoking the applicable evidentiary rules. Presumably borrowing the test articulated in *State v. Pennell,* Del.Super., 584 A.2d 513, 515 (1989), the Superior Court found that it needed to determine: 1) that the expert witness was qualified [D.R.E. 702]; 2) that the evidence offered was otherwise admissible, relevant and reliable [D.R.E. 401 & 402]; 3) that the bases for the opinion are those "reasonably relied upon by experts in the field" [D.R.E. 703]; 4) that the specialized knowledge being offered will assist the trier of fact to understand the evidence or determine a fact in issue [D.R.E. 702]; and 5) whether such evidence would create unfair prejudice, confuse the issues or mislead the jury [D.R.E. 403]. We affirm the court's rejection of *Frye* and its application of the Delaware Rules of Evidence for determining the general admissibility of the State's DNA expert testimony.

## V. DNA TYPING PROCEDURES

Before addressing the trial court's DNA evidentiary rulings, we state our understanding of the underlying concepts and principles generally employed by courts when confronted with DNA typing evidence. We recognize, as did the trial court, that this is an *atypical* case in that defendant chose not to present any DNA expert to contest or question the procedures and findings of the State's FBI experts. In nearly all the reported cases involving DNA evidentiary rulings, the trier of fact, and the appellate court, have been provided with the testimony of at least several expert witnesses, both in support of and opposition to the admission of the DNA evidence. *See, e.g., State v. Cauthron,* Wash. Supr. *(en banc),* 846 P.2d 502 (1993); *State v. Vandebogart,* 136 N.H. 365, 616 A.2d 483 (1992); *United States v. Yee,* N.D.Ohio, 134 F.R.D. 161 (1991); and *Jakobetz, supra.* Those cases were also decided several years after the instant case; and those trial courts, and appellate courts, have thus had the benefit of developing knowledge in this forensic science.

DNA court decisions since 1992 have relied upon a report of the Committee on DNA Technology in Forensic Science, National Research Council, *DNA Technology in Forensic Science* (National Academy Press April 1992) (hereafter *"DNA Committee Report"*). *See Cauthron,* 846 P.2d at 508–10; *Vandebogart,* 136 N.H. 365, 616 A.2d at 485–88. With the approval of this Court, and principally for our assistance, the record on appeal was supplemented to include this report, to which counsel has made reference in the briefing of the appeal.

DNA is an organic material found in chromosomes, which are contained in the

---

**5.** Previously we have found Delaware Rules of Evidence 401, 402, 403, 702 and 703 to be applicable. *See Santiago,* 510 A.2d at 489; *Fensterer,* 493 A.2d at 962 n. 3. In *Daubert, the Supreme Court relied upon several of the Federal Rules of Evidence which correspond to these Delaware rules. See Daubert,* — U.S. at — & —, 113 S.Ct. at 2795 & 2797.

**6.** The Supreme Court further explained the inquiry under FRE 702 as follows:

Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate. *Daubert,* — U.S. at —, 113 S.Ct. at 2797.

**7.** The Delaware Rules of Evidence are modeled after, and in many instances track, the Federal Rules of Evidence.

nucleus of a cell.[8] Human genes are said to be carried in 23 pairs of chromosomes, with one chromosome in each pair being inherited from each parent. Molecules of DNA provide the molecular genetic code that determines the unique characteristics of any living organism. In humans, DNA can be located in white blood cells, sperm, hair roots and saliva. A fundamental premise of molecular theory is that all inheritable information is contained in a DNA molecule and that every DNA molecule within an individual is identical.

The important feature of DNA for forensic science purposes is that, with the exception of identical twins, no two people have the same DNA makeup. Nevertheless, because human beings share more biological similarities than differences, most individuals share DNA molecules which are the same. There are, however, segments of DNA which are highly variable among individuals. The goal of DNA type testing is to detect these small differences among DNA samples taken from different individuals or sources.

DNA typing involves three steps: a DNA sample is "processed" or typed (which the FBI refers to as its "RFLP analysis"); and a DNA print is produced from two samples—one from the bodily material discovered at the crime scene and the other taken from the suspect. The second step involves a comparison or matching of the genetic-marker types of the different samples to determine whether the samples could have originated from the same source. Assuming a "match" is found to exist between the samples, the third step consists of a statistical analysis of population frequencies to ascertain the statistical significance of the match, *i.e.,* "What is the probability that such a match would have occurred between a suspect and a person drawn at random from the same population as the suspect?" *See DNA Committee Report* at 4.

## VI. ADMISSIBILITY OF MATCHING DNA EVIDENCE WITHOUT CORRESPONDING STATISTICAL EVIDENCE

■ The State characterizes the trial court's admission of the DNA matching evidence while excluding the State's statistical evidence as of "doubtful" validity. We go further and find the ruling erroneous as a matter of law. We hold that DNA matching evidence is inadmissible in the absence of a statistical interpretation of the significance of the declared match. Accordingly, admission of only one of these components without the other renders *all* of the DNA evidence inadmissible. We so hold for the following reasons.

The three-step process of DNA typing produces two distinct, but interrelated, items of information: 1) whether a match exists between the samples; and 2) if a match exists, the ratio expressing the statistical likelihood that "the crime scene samples came from a third party who had the same DNA pattern as the suspect." *Barney,* 10 Cal.Rptr.2d at 736; *see also Vandebogart,* 616 A.2d at 486. The latter correlation is necessary because, even though two human genomes may vary at approximately three million sites, the DNA typing analysis currently employed examines only a few sites for variation in the DNA sequence. *DNA Committee Report* at 74. The theory is that, besides identical twins, no two individuals will have entire DNA sequences which are identical. The DNA prints which result from the current FBI procedure may not be unique since the entire DNA molecule is not analyzed. Since two unrelated individuals may have identical DNA patterns from the fragments examined in a particular analysis, the po-

---

**8.** The following description of the science surrounding DNA typing evidence is derived from the record as well as the following cases and articles: *DNA Committee Report, supra;* Thompson, W.C. & S. Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va.L.R. 45, 53 (1989); *Jakobetz,* 955 F.2d at 791–93; *Cauthron,* 846 P.2d at 508–10; *United States v. Porter,* D.C.App., 618 A.2d 629 (1992); *Vandebogart,* 616 A.2d at 486–88; *People v. Pizarro,* 5 Dist., 10 Cal.App.4th 57, 12 Cal. Rptr.2d 436 (1992); *People v. Barney,* 1 Dist., 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731, 734–37 (1992); *Commonwealth v. Lanigan,* 413 Mass. 154, 596 N.E.2d 311 (1992); *Yee, supra; State v. Pierce,* 64 Ohio St.3d 490, 597 N.E.2d 107 (1992).

tential exists for a match to be mistakenly found. *Id.* For this reason, statistical interpretation regarding the probability of a coincidental match or the likelihood that two unrelated individuals have the same DNA type is necessary. The Committee on DNA Technology in Forensic Science has stated:

> To say that two patterns match, without providing any scientifically valid estimate ... of the frequency with which such matches might occur by chance, is *meaningless.*

*DNA Committee Report* at 74 (emphasis added).

Several courts consider the statistical calculation (third) step as the more important of the two pieces of information which constitute DNA evidence. *See, e.g., Porter,* 618 A.2d at 640 (statistics are an "integral part" of DNA evidence and "essential"); *Barney,* 10 Cal.Rptr.2d at 742 (statistical calculation is "pivotal element of DNA analysis"). Whether the statistical evidence is labeled "integral" or "pivotal," the statistical calculation is essential for the evidence to have relevance or meaning to the trier of fact.

Since the issuance of the *DNA Committee Report,* an overwhelming majority of courts have excluded the evidence of a match after finding the corresponding statistical calculation to be inadmissible because not scientifically reliable. *See Cauthron,* 846 P.2d at 516 (citing *Commonwealth v. Curnin,* Mass.Supr., 409 Mass. 218, 565 N.E.2d 440, 442 n. 7 (1991) and *Ex parte Perry,* Ala.Supr., 586 So.2d 242, 254 (1991)); *Vandebogart,* 616 A.2d at 494 (evidence of match not admissible if not accompanied by scientifically reliable population frequency estimate); *Lanigan,* 596 N.E.2d at 314 (match evidence "cannot be admitted without appropriate statistical support"); *Barney,* 10 Cal.Rptr.2d at 745; *but see Pierce,* 597 N.E.2d at 115 (statistical calcu-

lations go to the weight, not admissibility of DNA evidence).[9] We adopt this view and hold that DNA evidence is only admissible when *both* the evidence of a match and the statistical significance of the match are admissible. Thus, we reject the State's overly simplistic argument that statistics go simply to the weight, not the admissibility of the DNA matching evidence.

We find the Superior Court's rationale for admitting the State's evidence of a match while excluding its proffered statistical interpretation of the match to be flawed. The court excluded such evidence not on its own merits or for a found lack of reliability, but out of concern that the statistics would be overly prejudicial to the defendant and possibly confusing or misleading to the jury. The court's reference to Nelson's indigency seems misplaced, in the absence of any record evidence of an application for funds to employ an expert. In any event, we find the court's ruling inherently inconsistent since, without the necessary statistical calculations, the evidence of the match was "meaningless" to the jury and, thus, inadmissible. *See DNA Committee Report* at 74-75.

■ We need not consider or address other questions raised relating to the admissibility of DNA evidence, including whether the DNA typing procedures used by the FBI or the method used to calculate the statistical significance of a match are admissible under the Delaware Rules of Evidence. We decline to address these and related questions due to the inadequate record in this case. We only hold that, for DNA evidence to be admissible, *both* the procedures used to obtain a match *and* the statistical evidence interpreting the significance of a match must satisfy the Delaware standard applicable to the admissibility of scientific evidence. *See generally* section IV, *supra.* We would also suggest that in any subsequent DNA case a trial

---

**9.** The majority of courts that have excluded the statistical calculation information have done so due to a fundamental split in the scientific community. The principal area of disagreement lies with the population geneticists concerning the methodology of determining the statistics which interpret the significance of a match of DNA

patterns. *See DNA Committee Report* at 79-80; *Cauthron,* 846 P.2d at 513-16; *Vandebogart,* 616 A.2d at 493; *Barney,* 10 Cal.Rptr.2d at 740-41; *Lanigan,* 596 N.E.2d at 316. Since this is an area of science and law which is both fluid and developing, we defer the admissibility of statistical calculation evidence to another day.

court should consider the *DNA Committee Report* and any other peer literature related to this rapidly advancing scientific field.

## VII. HARMLESS ERROR

Delaware law on harmless error is well established. "[T]his Court has consistently refused to reverse convictions for errors found to be harmless." *Van Arsdall v. State*, Del.Supr., 524 A.2d 3, 10 (1987); *see also Dawson v. State*, Del. Supr., 608 A.2d 1201, 1204 (1992); *Johnson v. State*, Del.Supr., 587 A.2d 444, 451 (1991); *Michael v. State*, Del.Supr., 529 A.2d 752, 757–58 (1987). An error in admitting evidence may be deemed "harmless" when "the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction...." *Johnson*, 587 A.2d at 451 (citations omitted). Alternatively, when the evidentiary error is of a constitutional magnitude, the convictions may be sustained if the error is "harmless beyond a reasonable doubt." *Johnson*, 587 A.2d at 451 (citing *Van Arsdall*, 524 A.2d at 11); *see also Dawson*, 608 A.2d at 1204. We find the evidentiary error in this case to satisfy our harmless error standards.

A review of the entire record confirms that the evidence of record supporting defendant's conviction was overwhelming. We refer to: the videotape from the bank machine showing Nelson to be victim's assailant; the pubic hairs matching those of the victim found on Nelson's clothes; and victim's rings found on Nelson's person at the time of his arrest later the same day. Viewing the totality of the evidence, the evidence of defendant's guilt is not only substantial, untainted and direct, but conclusive. Defense counsel conceded as much at oral argument in response to the Court's questions when he candidly conceded that a harmless error analysis was appropriate. *Dawson*, 608 A.2d at 1204–05.

\* \* \*

AFFIRMED.