Roger ATKINSON, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 572,1999.

Supreme Court of Delaware.

Submitted: June 13, 2001.
Decided: July 18, 2001.

Andrew G. Ahern, III (argued), Joseph W. Benson, P.A., and Jerome M. Capone, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr. and Paul R. Wallace (argued), Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, STEELE, Justices and HARTNETT, Retired Justice.*

* Sitting by designation pursuant to Art. IV,  § 38, of the State of the Delaware Constitu-

STEELE, Justice:

On August 13, 1999 a jury convicted Roger Atkinson of Attempted Unlawful Sexual Intercourse Second Degree,[1] Act of Intimidation, Tampering with a Witness, and two counts of Tampering with Physical Evidence.[2] The jury, however, found Atkinson not guilty of the charges of Possession of a Deadly Weapon during Commission of a Felony (two counts) and Aggravated Menacing. Atkinson filed a timely notice of appeal.

At trial, Atkinson had moved for a mistrial based on an argument that the State had violated the principles set forth in *Brady v. Maryland*,[3] by withholding or delaying disclosure of certain material evidence. Notes of witness interviews taken by an investigating prosecutor were not disclosed until that prosecutor testified as the State's final witness. Once discovered in cross-examination, they revealed that the complainant, the State's main witness, had not initially described a sexual component to the assault to three of the State's witnesses. The State's unilateral determination that it need not disclose the material, Atkinson argues, deprived him of an opportunity for effective cross-examination of three critical witnesses presented by the State.

Because we find the notes to be favorable to the defense and material in that their timely disclosure may have affected the outcome of the trial, we find that the Superior Court erred by denying the defense motion for a mistrial. We reverse the Superior Court's judgment and remand this case for a new trial on the charge of Attempted Sexual Intercourse in the Second Degree.[4]

I

On September 20, 1997, Atkinson and his then estranged wife, Gaylene Atkinson, drove together to a commercial storage facility that they rented in Newark. Atkinson, who was legally blind, had asked Gaylene to drive him there. After they arrived, Atkinson learned that Gaylene had failed to pay the unit's rent. Nonetheless, the facility's staff permitted them to enter their storage unit. Atkinson and Gaylene began to argue about Gaylene's failure to pay the rent. Gaylene stated that after she and Atkinson entered the storage shed, Atkinson grabbed her by the neck and threatened her with a knife. After Atkinson allegedly forced her to remove her shirt, pants and shoes, Gaylene managed to break free. She ran to the storage facility office to call 911. Sherry McCann and James Sloan were in the facility's office when Gaylene entered. Gaylene stated that Atkinson had assaulted her and that she feared for her life. Because Gaylene was partially clothed, McCann asked Gaylene if Atkinson had raped her. Gaylene responded that he had not. Nor did Gaylene state to Officer

---

tion and Supreme Court Rules 2 and 4.

1. The indictment originally charged Atkinson with Attempted Unlawful Sexual Intercourse First Degree.

2. The State entered a *nolle prosequi* on Possession of a Deadly Weapon by a Person Prohibited before the case went to the jury.

3. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

4. Atkinson also argues that the Superior Court erred by denying his Motion to Suppress Evidence based upon the warrantless search of the locked storage shed. Because we grant Atkinson a new trial based on the Brady violation, we need not address that argument. Since appellant conceded that the *Brady* argument did not apply to his other convictions, no new trial is ordered on (1) Act of Intimidation; (2) Tampering with a Witness; and (3) two counts of Tampering with Physical Evidence. Accordingly, those convictions are affirmed.

Buglio, one of the first police officers at the scene that there had been any sexual component to the assault.

Gaylene gave a statement to police later that night, stating for the first time that Atkinson had assaulted her with a knife and had attempted sexual relations. Twice before trial, however, Gaylene changed her statement regarding the alleged sexual assault. In fact, Gaylene recanted her evening statement about the alleged attempted sexual intercourse, but later indicated that Atkinson had forced her to recant. These statements by Gaylene led the State to charge Atkinson with intimidation and witness tampering.

Daniel Miller, the Deputy Attorney General originally assigned to prosecute the case, concerned that Gaylene might not testify consistently with her original statement to the police, if at all, contacted McCann, Sloan and Buglio during an investigation to determine if Gaylene had made any spontaneous utterances that could constitute admissible hearsay of actual attempted sexual intercourse. Miller took notes of his conversations with McCann and Sloan, including statements by McCann and Sloan that Gaylene had not mentioned any sexual component and had, in fact, denied that she had been "raped." Miller also contacted Officer Buglio who stated that Gaylene did not mention any sexual component to the assault while the police were at the scene. McCann and Sloan ultimately testified in the State's case in chief. Buglio did not testify at trial. In fact, at trial, the sole evidence of sexual intercourse came from Gaylene's testimony and any inference that might be properly drawn from her physical appearance immediately after the assault.

The State called Miller at trial to testify about the intimidation and witness tampering charges. During his testimony, however, he referred to his notes. Upon request, the Court permitted Atkinson's counsel to review Miller's notes. When Atkinson's counsel saw for the first time that McCann and Sloan had affirmatively discounted the spontaneous utterance theory, he immediately moved for a mistrial arguing that the State had failed to provide him information that would have been material to his effective cross-examination of McCann, Sloan and Gaylene. After argument, the Superior Court denied the motion.

II

■ This Court reviews *de novo* a defendant's allegation that the trial court committed an error in formulating and applying the law.[5] "In this case we confront another instance of the prosecution pressing the boundaries of propriety with the apparent hope that the issue is likely to be held harmless error."[6] Atkinson argues that the State violated *Brady* by failing to disclose notes reflecting Miller's conversations with McCann, Sloan and Buglio. Atkinson argues that the notes were material in that if he had them before trial, he would have been able to cross-examine McCann, Sloan and Gaylene about her failure to mention immediately after the incident any sexual component to Atkinson's assault. He argues that once he discovered the existence of the notes during Miller's cross and realized their significance, only a mistrial could remedy the prejudice the State caused by withholding the information until its last witness testified.

■ As we recently stated in *Jackson v. State*,[7] "[e]ffective cross-examination is

5. *See Jones v. State*, Del.Supr., 745 A.2d 856, 860 (1999); *Downs v. State*, Del.Supr., 570 A.2d 1142, 1144 (1990).

6. *Warren v. State*, Del.Supr., 633 A.2d 372, No. 535, 1992, Moore, J. (Nov. 1, 1993) (ORDER).

7. Del.Supr., 770 A.2d 506 (2001).

essential to a defendant's right to a fair trial. It is the 'principal means by which the believability of a witness and the truth of [her] testimony are tested.'"[8] In Delaware, "the jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in testimony."[9] As such, "[j]urors should be afforded every opportunity to hear impeachment evidence that may undermine a witness' credibility."[10]

■ Because the right to cross-examination is fundamental to a fair trial, a new trial will be ordered when the State fails to provide the defendant with material evidence that is favorable to the accused. "Impeachment evidence ... falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal."[11]

■ In *Brady v. Maryland* the United States Supreme Court held that the State cannot suppress evidence favorable to a defendant if that evidence is material either to guilt or to punishment.[12] If the evidence is both favorable and material, a determination must be made whether its "delayed disclosure precluded... effective use of the information at trial."[13] If the defendant was unable to use the evidence

effectively because of delayed disclosure, a new trial is warranted.

■ A delay in disclosing impeachment evidence may not be material if the defendant has an opportunity to use the material effectively nonetheless.[14] When "a defendant is confronted with delayed disclosure of *Brady* material, reversal will be granted only if the defendant was denied the opportunity to use the material effectively."[15]

In *Strickler v. Greene*,[16] the United States Supreme Court explained the meaning of the term "Brady violation" and "the special role played by the American prosecutor in the search for truth in criminal trials."[17] The United States Supreme Court describes the "special status" of the prosecutor as follows:

> [T]he representative not· of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.[18]

> \*    \*    \*    \*    \*    \*

This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily

---

**8.** *Id.* at 515 (citing *Fensterer v. State*, Del. Supr., 493 A.2d 959, 963 (1985)).

**9.** *Id.* (citing *Pryor v. State*, Del.Supr., 453 A.2d 98, 100 (1982)).

**10.** *Id.*

**11.** *Id.* (citing *Michael v. State*, Del.Supr., 529 A.2d 752, 756 (1987)); *see also Bagley v. United States*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**12.** 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**13.** *Lilly v. State*, Del.Supr., 649 A.2d 1055, 1057 (1994).

**14.** *See Rose v. State*, Del.Supr., 542 A.2d 1196, 1199 (1988) (citing *United States v. Johnston*, 1st Cir., 784 F.2d 416, 425 (1986)).

**15.** 542 A.2d at 1199.

**16.** 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

**17.** *Id.* at 279, 119 S.Ct. 1936.

**18.** *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

establishes that the outcome was unjust. Thus the term *"Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called *"Brady* material"—although, strictly speaking, there is never a real *"Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.[19] In this case, as in most cases where the issue of a *"Brady* violation" is raised, the focus is on the third component—materiality.

■ The United States Supreme Court expanded the definition of materiality in *Kyles v. Whitley*.[20] In *Kyles,* the Court held that materiality does not require a showing that the suppressed evidence ultimately would have resulted in an acquittal. Rather, the *Kyles* Court required that the defendant, in light of the undisclosed evidence, receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence." [21] Thus, in order to show a reasonable probability of a different result, a defendant need only show that the suppressed evidence "undermines [the] confidence in the outcome of the trial." [22]

Here, Gaylene's inconsistent positions cause the State to attempt to bolster its case by an effort to discover admissible hearsay evidence of spontaneous utterances to support Gaylene's most recent version of the facts in the event she would not be forthcoming on the stand. The State's further inquiry disclosed that she did not initially claim that Atkinson had attempted sexual intercourse. Nonetheless, the trial prosecutor unilaterally determined that notes documenting that fact would neither be favorable to the defense nor aid in defense counsel's cross-examination of three of the State's witnesses, and he concluded that he need not disclose them.

The complainant's credibility on the critical issue of the circumstances surrounding the assault was undeniably central to the case. The jury disbelieved her claim that Atkinson had used a weapon during the assault and found Atkinson not guilty of three related offenses. Atkinson may have been able to use the notes to impeach Gaylene more effectively if he had known in a timely manner of her earlier inconsistent statements to McCann, Sloan and Buglio. Attempted sexual intercourse, after all, was the critical element of a crime that carries a minimum ten-year imprisonment. Because the notes suggested inconsistent statements by the alleged victim, use of the notes may have impacted the jury's assessment of Gaylene's credibility and therefore the outcome of the trial on the charge of Attempted Unlawful Sexual Intercourse Second Degree. The fact that the State intentionally withheld that information until ordered to turn it over by the Superior Court after those witnesses who would have been cross-examined had already testified causes us to question

---

19. *Strickler,* at 281–282, 119 S.Ct. 1936; *see also* Stanley Z. Fisher, *The Prosecutor's Ethical Duty to Seek Exculpatory Evidence in Police Hands: Lessons from England,* 68 FORDHAM L. REVIEW 1379 (2000).

20. 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

21. *Id.* at 434, 115 S.Ct. 1555.

22. *Id.*

whether this trial resulted in a verdict "worthy of confidence."

 Applying the *Kyles* test, it is clear that the delayed disclosure constituted a suppression of favorable evidence that would be material to impeachment of one or more key witnesses. Gaylene's credibility would have been significant to the jury and an opportunity for effective cross-examination was essential for Atkinson to receive a fair trial. Had the notes been made available to defense counsel before trial, the cross-examination of these witnesses may have changed the outcome of the trial. The verdict on the lesser included offense, demonstrates the jury's reluctance to accept Gaylene's testimony touching upon the gravity of the charges in their entirety.

This evidence was both favorable to Atkinson and material in that it may have affected the outcome of the trial. Because the State withheld this evidence making it unavailable for effective cross-examination, we must conclude that there is a "reasonable probability of a different result" had the favorable evidence the State withheld been provided in a timely fashion. The Superior Court should have granted the Motion for a Mistrial. Therefore, we reverse the judgment of the Superior Court and remand this case for a new trial.