# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,     )
                             )
         Plaintiff,      )
                             )
                             )
     v.                  )     Cr. ID. No. 1606002410 A/B
                             )
                             )
MARZETTE KING,      )
                             )
         Defendant.    )

Submitted: March 12, 2025
Decided: June 6, 2025

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE GRANTED

Matthew C. Bloom, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Natalie S. Woloshin, Esquire, 3200 Concord Pike, P.O. Box 7329, Wilmington, Delaware, Attorney for Defendant Marzette King.

PARKER, Commissioner

# SUMMARY

Defendant Marzette King, with the assistance of court-appointed counsel, raised a number of claims in his Rule 61 postconviction relief motion. For the reasons discussed herein, the Court finds King's claim of a *Brady* violation to be meritorious. The Court finds that the State committed a *Brady* violation when it failed to advise King's trial counsel that King's co-defendant, Randy Barber, would testify at King's trial that the guns belonged to him (Barber) and that he never saw King with any guns.

To put the importance of Barber's statements in context, both King and Barber were living at the residence at issue and both sold marijuana from the residence. Three guns were found at the residence. Barber was given a plea offer to probation. King was given a plea offer to 25-years imprisonment as a habitual offender. Barber accepted his plea and was sentenced to probation. King rejected his plea, went to trial, and was convicted on all the charges. On the gun charges stemming from the three guns at issue, King was sentenced to 120-years imprisonment.

For the reasons discussed herein, in light of this *Brady* violation, the judgment should be set aside and a new trial granted.

# PROCEDURAL HISTORY

Marzette King and his co-defendant, Randy Barber, were arrested on June 3, 2016, and indicted on August 15, 2016. They were both charged with Drug Dealing Marijuana, Possession of Drug Paraphernalia, three counts of Possession of a Firearm During the Commission of a Felony ("PFDCF"), three counts of Possession or Control of a Firearm by a Person Prohibited ("PFBPP"), one count of Possession or Control of Ammunition by a Person Prohibited ("PABPP"), and Conspiracy Second Degree.

Barber was offered a plea deal to drug dealing marijuana and conspiracy second degree with a recommended sentence by the State to probation.[1] King was offered a plea deal to one count of PFDCF as a habitual offender with a recommended sentence by the State to the minimum-mandatory term of 25-years incarceration.[2] Barber accepted his plea. King rejected his plea.

On January 20, 2017, Barber accepted the State's plea offer and pled guilty to drug dealing marijuana and conspiracy second degree.[3] The Court followed the

---

[1] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement).
[2] Marzette King Plea Offer dated January 9, 2017.
[3] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement).

State's recommendation and sentenced Barber to probation.[4] The plea agreement did not require Barber to testify at King's trial.[5]

King proceeded to trial. Prior to trial, the State dismissed the conspiracy second degree charge against King.[6]

Prior to trial, the three counts of PFBPP and the one count of PABPP were severed and were to be decided by the same jury immediately following the verdict on the other charges. King's trial began on May 9, 2017. On May 11, 2017, a jury found King guilty of all charges, including the severed PFBPP/PABPP charges.

On June 14, 2017, the State filed a motion to declare King a habitual offender on all the convictions on all the gun charges.[7] There were three guns at issue, and convictions for PFDCF and PFBPP as to each of the three guns, for a total of six convictions on the gun charges.[8]

Prior to ruling on the State's habitual offender petition, the Court asked to speak with the attorneys privately in a conference room.[9] During that conference, the Court asked the State to reconsider its position that habitual status was warranted on all six of the convictions on the gun charges.[10] The Court also

---

[4] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A691-693 (Barber Sentencing Order).
[5] See, as to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement).
[6] May 9, 2017 Trial Transcript, at pg. 14.
[7] As to ID No. 1606002410A: D.I. 28- June 14, 2017 Motion to Declare King a habitual offender.
[8] *Id.*
[9] July 13, 2017 Sentencing Transcript, at pg. 2.
[10] July 13, 2017 Sentencing Transcript, at pg. 3-7.

expressed concern as to the inequity of the vast disparity of the sentences between the two co-defendants.[11] The Court thought it was "draconian" to move for habitual status on all six gun convictions.[12] The Court urged the State to seek habitual status on only one of the gun charges, in which event King would still be facing a lengthy prison term.[13]

The State elected to continue to pursue habitual status on all six of the gun convictions. The Court, not having any discretion, was compelled to grant the State's habitual status petition.[14] As to each of the three firearms, King was sentenced to 25 years minimum-mandatory on the PFDCF conviction, and 15 years minimum-mandatory on the PFBPP conviction, 40 years imprisonment per firearm, for an aggregate sentence of 120 years of incarceration.[15]

On the remaining convictions, drug dealing, possession of drug paraphernalia, and PABPP, King was sentenced to probation.[16]

King's direct appeal was denied by the Delaware Supreme Court on September 24, 2018.[17] The mandate was issued on October 15, 2018.[18] King did not become aware of the denial of his appeal until March 2020, beyond the one-

---

[11] July 13, 2017 Sentencing Transcript, at pg. 3-4, 7.
[12] July 13, 2017 Sentencing Transcript, at pg. 5-6.
[13] July 13, 2017 Sentencing Transcript, at pg. 3-5.
[14] As to ID No. 1606002410A: D.I. 30- July 13, 2017 Order granting State's habitual offender motion.
[15] As to ID No. 1606002410A: D.I. 31- July 13, 2017 Sentencing Order; July 13, 2017 Sentencing Transcript, at pg. 16-17.
[16] As to ID No. 1606002410A: D.I. 31- July 13, 2017 Sentencing Order.
[17] *King v. State,* 2018 WL 4671232 (Del.).
[18] As to ID No. 1606002410A: D.I. 40- Mandate filed from Delaware Supreme Court.

year period for the timely filing of a Rule 61 motion. Rule 61 counsel requested that the Delaware Supreme Court reissue its mandate so that the one-year period could be reset for the timely filing of a Rule 61 motion. The State opposed the motion.

On March 9, 2023, the Delaware Supreme Court found that the reissuance of the mandate was appropriate and granted King's motion.[19] On March 27, 2023, the mandate was reissued.[20]

Counsel was appointed to represent King on this Rule 61 motion.[21] After the Delaware Supreme Court reissued the mandate on King's direct appeal, King had one year to timely file his Rule 61 motion. The mandate was reissued on March 27, 2023, and on March 27, 2024, King filed an Amended Motion for Postconviction Relief.

Upon the filing of the Amended Rule 61 motion, a briefing schedule was entered. King's trial counsel was directed to submit an Affidavit responding to the ineffective assistance of counsel claims raised. The State was directed to file a response to the motion and Rule 61 counsel filed a reply thereto.[22]

After briefing was completed, on March 12, 2025, a hearing was held to further address some of the claims raised in King's Rule 61 motion.

---

[19] *King v. State,* No. 312, 2017 (Del. March 9, 2023).
[20] As to ID No. 1606002410A: D.I. 69- Delaware Supreme Court reissued mandate.
[21] As to ID No. 1606002410A: .D.I. 44 - Order appointing Rule 61 counsel.
[22] As to ID No. 1606002410A: D.I. 73- Rule 61 briefing schedule.

## FACTS

Marzette King and co-defendant Randy Barber both resided at 218 West 22nd Street, Wilmington, Delaware. The house was owed by King's uncle, the brother of King's mother.[23] King's uncle was a retired police officer who had been shot and was paralyzed and bedridden.[24]

Marzette King had a brother, DaShawn King, who also resided at Marzette's uncle's house but was "away" during the time period at issue.[25] At the time of sentencing in July 2017, DaShawn had been "away" for almost three years.[26]

Randy Barber grew up around Marzette and DeShawn King but is not related to them or to their uncle.[27]

At the time of this incident, Marzette King was a six- time convicted felon.[28] Marzette was convicted in 2000 of three counts of Robbery in the First Degree and

---

[23] July 13, 2017 Sentencing Transcript, at pg. 23; As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion attached as Exhibit C (the undated Interview Recording of Randy Barber).

[24] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion attached as Exhibit C (the undated Interview Recording of Randy Barber); May 9, 2017 Trial Transcript, at pgs. 41-42.

[25] July 13, 2017 Sentencing Transcript, at pg. 20-24.

[26] July 13, 2017 Sentencing Transcript, at pg. 24.

[27] July 13, 2017 Sentencing Transcript, at pg. 24-25; D.I. 82- State's Response to Rule 61 Motion attached as Exhibit C (the undated Interview Recording of Randy Barber).

[28] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 12; D.I. 28- June 14, 2017 Motion to Declare King a habitual offender.

one count of Burglary in the First Degree, in 2005 with Possession with Intent to Deliver; and in 2010 with aggravated menacing.[29]

Barber was a two- time convicted felon.[30] Barber was convicted in 1998 of trafficking cocaine 5-50 grams and in 2003 for maintaining a vehicle.[31]

Both King and Barber are prohibited from possessing a firearm or ammunition.[32]

## The Underlying Events

It is undisputed that both Marzette King and Randy Barber sold marijuana from the residence.[33] After Marzette was arrested, in his post-Miranda interview

---

[29] As to ID No. 1606002410A: D.I. 28- June 14, 2017 Motion to Declare King a habitual offender with supporting documentation.

[30] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement) & A676 (Barber Immediate Sentencing Form).

[31] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement) & A676 (Barber Immediate Sentencing Form).

[32] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 12.

[33] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement)(Barber admitted to drug dealing marijuana as part of his plea); D.I. 71 Appendix to Rule 61 Motion at A681-689 (Barber's plea colloquy); D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peache Court No. 11 Commitment (After his arrest, King admitted to the police that he sells marijuana from the residence); D.I. 82- State's Response to Rule 61 Motion, Exhibit C (Barber's Interview Recording admitting he and King sold marijuana from the residence).

7

with the police, he admitted that he sold marijuana from the residence.[34]  Barber pled guilty to drug dealing marijuana and admitted to doing so.[35] Later, in the undated recorded interview with the State's detective that occurred sometime during the briefing on this Rule 61 motion, Barber again reiterated that he and King sold marijuana from the residence.[36]

Corporal Evans, an officer employed by the Wilmington Police Department was contacted by a Cooperating Source ("C.S.") and advised that Randy Barber was selling marijuana from his residence at 218 West 22nd Street.[37]  The C.S. also told Corporal Evans that Randy Barber keeps a firearm inside of the residence for the protection of his illegal drug distribution organization.[38]  The C.S. told Corporal Evans that Randy Barber keeps the firearm under a seat cushion of a

---

[34] As to ID No. 1606002410A : D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016;  June 14, 2016 Preliminary Hearing Transcript, at pg. 11-12.

[35] As to ID No. 1606002410A:  D.I. 71-  Appendix to Defendant's Amended Rule 61 Motion, at A685-A686  (January 20, 2017 Barber Plea Hearing, pgs. 8-9).

[36] As to ID No. 1606002410A:  D.I. 82- State's Response to Rule 61 Motion attached as Exhibit C (the undated Interview Recording of Randy Barber).

[37] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pgs. 4, 13.

[38] As to ID No. 1606002410A : D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pgs. 4, 13.
.

red/burgundy couch in the living room.[39]  The C.S. stated that he has observed the firearm on several occasions.[40]

Corporal Evans was also advised by a different individual, a confidential informant, that Marzette King was known to sell marijuana from the same residence.[41]

A controlled buy was arranged whereby the Confidential Informant was sent to the residence to purchase marijuana.  The Confidential Informant purchased one bag of marijuana from King who was standing outside in front of the residence.[42] After the transaction, the Confidential Informant observed Marzette King hand a large bag of marijuana to Randy Barber who was standing on the front porch of the residence, and Randy Barber returned inside the residence with the large bag of marijuana.[43]

---

[39] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016.

[40] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016.

[41] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 4-5.

[42] As to ID No. 1606002410A:  D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 5-6.

[43] D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 7-8, 20.
.

## The Execution of the Search Warrant

On June 3, 2016, the police obtained a search warrant to search the residence and on that same day executed the warrant.[44] Upon approaching the residence, King was standing outside the residence next to his vehicle, a 1993 Chevrolet Suburban SUV.[45] King was taken into custody without incident.[46]

At the time of his arrest, King was searched and one clear plastic sandwich bag containing marijuana was found on him.[47] He also had $670 in cash.[48] In King's vehicle the police found marijuana and a digital scale.[49]

The officers then entered the residence to execute the search warrant. Upon entering the residence, Randy Barber was sitting in a chair in the living room.[50]

---

[44] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 7.

[45] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pgs. 7-8.

[46] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pgs. 7-8.

[47] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 7-8.

[48] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016.

[49] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 8.

Also in the residence was an older gentleman, King's uncle, who was bedridden.[51] He was in the dining room area of the residence with a person who appeared to be his caretaker or nurse.[52]

Before beginning the search of the residence, the officers asked Randy Barber if there was anything illegal in the residence. Randy Barber stated that he had some weed in his bedroom dresser.[53] When asked if there were any firearms in the residence, Barber became very nervous and his entire body started to shake. He started breathing heavily and started to perspire. The police officer saw Barber glance over to the maroon/burgundy couch and then immediately look away. He then stated that there were no firearms in the residence.[54] Based on Barber's

[50]As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 9.

[51] May 9, 2017 Trial Transcript, at pgs. 41-42; As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion attached as Exhibit C (the undated Interview Recording of Randy Barber).

[52] May 9, 2017 Trial Transcript, at pgs. 41-42, 79; May 10, 2017 Trial Transcript, at pgs. 134-135.

[53] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 23.

[54] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pgs. 23-24; May 9, 2017 Trial Transcript, at pgs. 78-79.

reaction to the question, Corporal Evans had no doubt there were guns in the couch.[55]

Under the cushions of the maroon/burgundy couch the police located two firearms. A black Canik 55 9 mm handgun with 17 rounds of ammunition and a Ruger SR9 9mm handgun with a silver slide and black receiver loaded with ten 9 mm rounds of ammunition.[56]

There was a makeshift bedroom on the first floor of the residence where King's uncle slept in order to accommodate his physical limitations.[57] There were four bedrooms on the second floor.[58] There was a second-floor front bedroom, two hallway bedrooms, and a rear bedroom.[59]

In the second-floor front bedroom, police found mail addressed to Marzette King. They also found a clear bag containing marijuana, three digital scales, sandwich bags, and vacuum sealed bags.[60]

In the second-floor hallway bedroom, located next to the bathroom, the police found two boxes of .38 special ammunition located in the top dresser drawer

---

[55] June 14, 2016 Preliminary Hearing Transcript, at pg. 24.

[56] As to ID No. 1606002410A: D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 9.

[57] May 9, 2017 Trial Transcript, at pgs. 79-80.

[58] June 14, 2016 Preliminary Hearing Transcript, at pgs. 26-28.

[59] June 14, 2016 Preliminary Hearing Transcript, at pgs. 26-28.

[60] D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 9-10, 25; May 9, 2017 Trial Transcript, at pgs. 47-49.

of the bedroom.[61]   The ammunition did not fit any of the guns found in the residence and was not the sort of ammunition used for any of the firearms that were recovered in the residence.[62]   In this bedroom, police also found a piece of mail addressed to Marzette King, a tuxedo rental receipt with Marzette's name on it; male clothing in Marzette's size, a photo album containing pictures of Marzette King, and a marriage certificate with the name of Marzette King on it.[63]

As the State recognized, it was apparent that these two rooms were used by Marzette King because these rooms contained mail addressed to him, his clothes, his photographs, and his other personal belongings.  Everything one would keep in a bedroom.[64]

In the second-floor rear bedroom, police found mail addressed to Randy Barber, two bags of marijuana, a digital scale, a black LG phone, and a black Samsung smart phone.[65]   This bedroom belonged to Randy Barber because his personal belongings and everything one would keep in a bedroom was in this bedroom.

---

[61] D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016; June 14, 2016 Preliminary Hearing Transcript, at pg. 27.

[62] May 9, 2017 Trial Transcript, at pg. , 51-56, 61-62.

[63] D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016.

[64] May 9, 2017 Trial Transcript, at pgs. 51-56; May 11, 2017 Trial Transcript, at pgs. 7-8.

[65] D.I. 1- Affidavit of Probable Cause attached as Exhibit B to Justice of Peace Court No. 11 Commitment filed in the Superior Court on June 15, 2016.

In a fourth bedroom, the bedroom located in the hallway north of the stairs, the police found a black Anderson AM-15 rifle in the closet.[66] The rifle was not loaded.[67] There was no ammunition found anywhere in the house that could be used with this rifle.[68] In this bedroom, the police also found mail addressed to DaShawn King.[69] There was male clothing piled up in the closet such that you could not fully shut the closet door in this bedroom.[70] The rifle was found in the closet laying on top of clothing.[71] The room looked as if no one had lived in there for a long time.[72]

Using the same logic used to deduce the occupants of the other three bedrooms, this bedroom belonged to Marzette's brother DeShawn. His clothes were there, his mail was there, and it looked like someone had not lived there for a long time consistent with DeShawn being "away" from his bedroom for almost three years.[73]

---

[66] June 14, 2016 Preliminary Hearing Transcript, at pgs. 10, 25-26.
[67] May 9, 2017 Trial Transcript, at pg. 58.
[68] May 11, 2017 Trial Transcript, at pg. 23.
[69] May 9, 2017 Trial Transcript, at pgs. 85-86.
[70] June 14, 2016 Preliminary Hearing Transcript, at pg. 27; May 9, 2017 Trial Transcript, at pgs. 82-86.
[71] May 10, 2017, at pgs. 133-134.
[72] May 9, 2017 Trial Transcript, at pgs. 58-60, 82-86.
[73] See, July 13, 2017 Sentencing Transcript, at pg. 24 (DeShawn lived at the residence but was "away" for almost three years).

## DNA Test Results

The State conducted DNA testing on the three firearms. The DNA testing was performed for Marzette King and Randy Barber. No DNA testing was performed for DaShawn King or Marzette's uncle, individuals related to Marzette King either currently residing (Marzette's uncle) or that had been residing (DaShawn King) at the residence. These individuals were not related to Barber.

The DNA results are set forth in a report dated November 12, 2016. [74] The DNA results are as follows:

- **Gun No. 1**: **Canik 9 MM semi-automatic pistol (found under the seat cushions of the couch in the living room)**

  Grip- mixed DNA profile

  Consistent with a mixture of at least three (3) individuals, at least one of which is male. No conclusions can be made due to the complexity of the mixtures.

  Slide- mixed DNA profile

  Consistent with a mixture of two (2) individuals, at least one of which is male. No conclusions can be made regarding the inclusion or exclusion of Marzette King and Randy Barber to this mixture.

  Trigger- mixed DNA profile

  Consistent with being a mixture of two (2) individuals, at least one of which is male. Marzette King can be included as a potential DNA contributor to this mixture. Randy Barber is excluded as a potential DNA contributor to this mixture.

---

[74] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A077-A080 (November 22, 2016 DNA Report); May 10, 2017 Trial Transcript, at pgs. 96-106.
.

The probability of randomly selecting an *unrelated* individual that can be included as a contributor is, *inter alia,* 1 in 468 in the African American population.

Hammer- mixed DNA profile

Consistent with being a mixture of two (2) individuals. Marzette King and Randy Barber are excluded as potential contributors to this mixture.

Magazine- no conclusions can be made

Cartridge – no conclusions can be made

- **Gun No. 2**: **Ruger 9 mm semi-automatic pistol (found under the seat cushions of the couch in the living room)**

Grip- mixed DNA profile

Consistent with a mixture of at least three (3) individuals, at least one of which is male. No conclusions can be made due to the complexity of the mixtures.

Slide- mixed DNA profile

Consistent with a mixture of at least three (3) individuals, at least one of which is male. No conclusions can be made due to the complexity of the mixtures.

Trigger- mixed DNA profile

Consistent with being a mixture of two (2) individuals, at least one of which is male. The DNA profile of the major contributor is consistent with an unknown individual. No conclusions can be made regarding the minor DNA contributor.

Magazine- no DNA profile

Cartridge- no DNA profile

- **Gun No. 3**:  **Anderson 223 cal. rifle   (found unloaded in DaShawn King's bedroom closet)**

Grip- mixed DNA profile

Consistent with being a mixture of two (2) individuals, at least one of which is male.  Marzette King can be included as a potential DNA contributor to this mixture.  Randy Barber is excluded as a potential DNA contributor to this mixture.

The probability of randomly selecting an *unrelated* individual that can be included as a contributor is, *inter alia,*  1 in 2 in the African American population.

Slide- mixed DNA profile

Consistent with a mixture of at least three (3) individuals, at least one of which is male.  No conclusions can be made due to the complexity of the mixtures.

Trigger- mixed DNA profile

Consistent with being a mixture of two individuals.  Marzette King can be included as a potential contributor to this mixture.  Randy Barber is excluded as a potential DNA contributor to this mixture.

The probability of randomly selecting an *unrelated* individual that can be included as a contributor is, *inter alia,*  1 in 40,490 in the African American population.

Stock- mixed DNA profile

Consistent with a mixture of at least three (3) individuals, at least one of which is male.  No conclusions can be made due to the complexity of the mixtures.

The DNA analyst testified at trial. She explained that when no conclusion can be made, you cannot say whether the person is included or excluded.[75]

The DNA analyst further explained that when DNA is found, you do not know when the DNA was actually left on an object or how it ended up on the object.[76]

In sum, the DNA test results on the three guns at issue revealed that Marzette King's DNA could be included as a potential contributor on the trigger of the Canik 9mm, and excluded as a contributor on the hammer. No conclusions could be drawn on the grip, slide, magazine and cartridge of the Canik 9 mm gun. As to the Ruger 9 mm, no conclusions could be drawn from the DNA testing as to whether King could be included or excluded. On the Anderson rifle, Marzette King's DNA could be included as a potential contributor on the trigger and grip of the Anderson 223 caliber rifle, no conclusions could be drawn on the slide or stock.

As to Barber, the DNA results excluded him as a potential contributor from the trigger and slide of the Canik 9 mm gun. No conclusions could be made as to whether Barber was included or excluded as a potential contributor on the grip, hammer, magazine and cartridge. As to the Ruger 9 mm gun, like Marzette King, no conclusions could be drawn from the DNA testing as to whether Barber was included or excluded as a potential contributor. On the Anderson rifle, Barber was

---

[75] May 10, 2017 Trial Transcript, at pgs. 90-91, 97.
[76] May 10, 2017 Trial Transcript, at pg. 116; May 11, 2017 Trial Transcript, at pg. 21.

excluded as a contributor on the grip and trigger. No conclusions could be made as to whether Barber was included or excluded as a possible contributor on the slide or stock.

## The Plea Offers

Despite the C.S. observing Randy Barber with a firearm on several occasions that he kept under the seat cushion of the couch in the living room, and despite Randy Barber's visceral reaction to the police officer's questioning during the search of the residence as to whether there were any firearms in the residence, the State offered Randy Barber a plea to drug dealing marijuana and conspiracy second degree, with a recommended sentence to probation.[77]

Despite the fact that no guns were found in Marzette's vehicle, person or bedrooms, and the only evidence possibly linking Marzette to the guns at issue were the DNA test results, the State offered King a plea deal to one count of PFDCF, with sentencing as a habitual offender, with a recommended sentence of 25 years incarceration.[78]

Barber accepted his plea offer. King rejected his plea offer.

On January 20, 2017, Barber pled guilty to Drug Dealing Marijuana and Conspiracy Second Degree.[79] During his plea colloquy, Barber admitted that on

---

[77] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Barber Plea Agreement).
[78] Marzette King Plea Offer dated January 9, 2017.
[79] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Plea Agreement).

June 3, 2016, he knowingly possessed marijuana with the intent to deliver.[80]

Barber also admitted that, on June 3, 2016, "while intending to promote or facilitate the commission of the felony of drug dealing and possession of a firearm during the commission of a felony, he agreed with Marzette King they would commit one of the felonies, and one of them did some act in furtherance of the felony."[81]

A condition of the plea agreement was that Barber "forfeit any interest in the firearms seized during this incident."[82] During the plea colloquy, Barber's counsel stated that the agreement to forfeit any interest in the firearms was "easy since Mr. Barber never claimed an ownership interest in the firearm."[83] The Court followed the State's recommendation and sentenced Barber to probation.[84]

The plea agreement did not require Barber to testify at King's trial.

---

[80] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A685-686 (January 20, 2017 Barber Plea Hearing, pgs. 8-9).

[81] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A686-687 (January 20, 2017 Barber Plea Hearing, pgs. 9-10).

[82] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A675 (Plea Agreement).

[83] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A683 (January 20, 2017 Barber Plea Hearing, pg. 6).

[84] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A691-693 (Barber Sentencing Order).

## State's Pretrial Interview with Barber

After Barber accepted his plea agreement, and while he was serving his probation sentence, the charges against King proceeded to trial.

King's trial was scheduled to begin on March 7, 2017,[85] but was continued until April 11, 2017.[86] The parties thereafter mutually agreed to continue the trial to May 9, 2017.[87]

The State arranged a meeting through Barber's probation officer to interview Barber about his trial testimony in King's trial.[88] It appears that this meeting took place on April 5, 2017.[89]

The attendees at this meeting were two State Prosecutors, Investigating Officer Neil Evans, and Randy Barber.[90]

This interview was not recorded and no contemporaneous notes were provided.

Randy Barber, in his Affidavit dated January 25, 2022, represents that at the meeting the State was insistent that he blame everything- the drug dealing and the guns- on Marzette King and that he testify at King's trial that everything belonged

---

[85] As to ID No. 1606002410A: D.I. 15.
[86] As to ID No. 1606002410A: D.I. 18.
[87] As to ID No. 1606002410A: D.I. 21.
[88] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibits D-H; As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A695-A696 (Affidavit of Barber).
[89] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibits D-H.
[90] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibit B (Affidavit of Officer Evans); As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A695-A696 (Affidavit of Barber).

to King. Barber told the State he would not do so. Barber told the State that he never saw King with any guns. He further told the State that if called as a witness at trial, he would testify that the guns were his (Randy Barber's).[91]

Officer Evans, in his Affidavit dated September 4, 2024, recalls that at the pretrial meeting, the State was insistent that Barber testify at King's trial.[92] Barber expressed his refusal to do so. He recalls that a State Prosecutor made a statement to the effect of: "Well, I'm putting you on the stand, and you're going to testify."[93] In response, Barber said: "That's fine, if you put me up there, I'll just say the guns were mine."[94]

After receiving King's Amended Rule 61 motion, with Randy Barber's Affidavit as an exhibit to that submission, the State had an investigator interview Barber. This interview was recorded and provided as Exhibit C to the State's response to the Rule 61 motion.[95]

In that recorded interview, Barber states that both he and Marzette King sold marijuana from Marzette's uncle's residence where they both lived. Barber stated that he never saw weapons in the house and he never saw King with any weapons.

---

[91] As to ID No. 1606002410A: D.I. 71- Appendix to Defendant's Amended Rule 61 Motion, at A695-A696 (Affidavit of Barber).

[92] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibit B (Affidavit of Officer Evans).

[93] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibit B (Affidavit of Officer Evans).

[94] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion Exhibit B (Affidavit of Officer Evans).

[95] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion, at pgs. 27-28, & Exhibit C (Randy Barber Rule 61 Interview Recording).

He further states that at the pretrial meeting with the State, the State wanted Barber to testify and blame everything on King. Barber refused to do so.[96]

Barber also told the Investigator that after his pretrial meeting with the State he called Marzette's wife and told her what the State was trying to do- trying to get him to blame everything on King.[97]

On the first day of trial the Court asked the State whether Barber would be called as a witness. The State replied that it did not know yet.[98]

Barber was never called as a witness to testify at Marzette King's trial.

It is undisputed that the State never advised Marzette King's trial counsel of Barber's statements during this pretrial meeting.

### Marzette King's Trial

At King's trial, the State essentially air brushed Barber completely out of the drug dealing operations.

Prior to the start of King's trial, the State dropped the conspiracy charge against King.[99] There was no mention at King's trial of Barber's plea. There was no mention that (as part of that plea) Barber had admitted that on June 3, 2016, that he was dealing marijuana and that he had conspired with King to do so.

---

[96] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion, Exhibit C (Randy Barber Rule 61 Interview Recording).

[97] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion, at pgs. 27-28, & Exhibit C (Randy Barber Rule 61 Interview Recording).

[98] May 9, 2017 Trial Transcript, at pg. 24.

[99] See, May 9, 2017 Trial Transcript, at pg. 14.

The State never mentioned that it was alerted to the residence at issue because it had received information from a C.S. that Barber was selling marijuana from the residence and that he (Barber) kept a firearm under the seat cushion of the couch in the living room, which the C.S. had seen Barber handle on several occasions.

The State never introduced the controlled buy during which Marzette King sold one bag of marijuana to the Confidential Informant outside the residence, while Barber was standing on the porch during the transaction. After the transaction, King handed Barber a large bag of marijuana and he (Barber) took the bag inside the residence.

The State's trial presentation painted the picture of King as the only drug dealer living in the residence and that the drug dealer needed protection leading to the only and inevitable conclusion that the guns had to be King's because nobody else in that house was dealing drugs.

King's trial began on May 9, 2017. The State called five witnesses. It first called Corporal Neil Evans who testified about the arrest of King and the search of his car and residence and the finding of the three guns inside the house.[100]

On cross-examination, King's trial counsel brought out Barber's visceral reaction to the police inquiry as to whether there were any firearms in the residence.[101]

---

[100] May 9, 2017 Trial Transcript, at pgs. 38-69.

The State then called a ballistics expert, Corporal Henry Law who testified that he was not able to obtain any identifiable fingerprints on the firearms.[102] The third witness was Ashley Rush from the Department of Forensic Science who testified that the substances seized were marijuana.[103] The fourth witness was Sergeant Andrew Lloyd who testified as a drug dealing expert. He testified that King possessed marijuana with the intent to deliver it, that drug dealers needed guns for protection, and that the guns found in the house were part of the drug dealing operation.[104]

Finally, the State called Niyrai Dawn Hall, a forensic DNA analyst, who testified about the DNA evidence.[105]

The State's theme throughout the trial, which it emphasized during closing argument, was that King was running a drug house on June 3, 2016, and while doing so he possessed three firearms.[106] Randy Barber was a user.[107] King was the drug dealer. Drug dealing is a dangerous business. Drug dealers need firearms to protect their product and themself.[108] This was the defendant's operation, the defendant's drugs, the defendant's guns, and the defendant's drug dealing.[109]

---

[101] May 9, 2017 Trial Transcript, at pgs. 78-79.
[102] May 9, 2017 Trial Transcript, at pgs. 94-102.
[103] May 10, 2017 Trial Transcript, at pgs. 8-25.
[104] May 10, 2017 Trial Transcript, at pgs. 28-52.
[105] May 10, 2017 Trial Transcript, at pgs. 81-116.
[106] May 11, 2017 Trial Transcript, at pg. 7.
[107] May 11, 2017 Trial Transcript, at pg. 11, 13.
[108] May 11, 2017 Trial Transcript, at pg. 9-13.
[109] May 11, 2017 Trial Transcript, at pg. 31.

King was convicted of all the charges.

The State moved to declare King a habitual offender on all six of the gun charges. For each of the three guns, King was convicted of PFDCF and PFBPP. King was sentenced to 25-years imprisonment for each conviction of PFDCF, and 15-years imprisonment for each conviction of PFBPP. 40-years imprisonment per gun, for a total period of 120-years imprisonment. He was sentenced to probation on the other convictions of drug dealing marijuana, PABPP, and possession of drug paraphernalia.

## KING'S RULE 61 MOTION

King raised a number of claims in his Amended Rule 61 motion. Because this Court finds that the failure to disclose the potentially exculpatory statements made by Barber during his pretrial interview with the State was a *Brady* violation and that, as a result thereof, the judgment should be set aside and a new trial held, it is unnecessary to address any of the remaining issues raised.

The 120- year question in this case was did King constructively possess the three firearms found in the residence. There was no direct evidence that showed that King had knowledge of the firearms or possessed those firearms.

Of the three guns, King's DNA profile was included as a potential contributor on the trigger of one of the guns found under the couch, and his DNA profile was found as a potential contributor on the grip and trigger of the rifle

26

found in the closet in his brother's room. King's uncle also resided at the residence, and his brother had resided at the residence, but no DNA testing was performed on either of these related individuals.

The only evidence potentially linking King to these two guns was the DNA test results. There were no DNA test results that potentially linked King to the second gun found under the couch.

Barber, King's co-defendant, also lived at the residence and was also a drug dealer. Barber was not related to any of the other individuals residing in the residence, and therefore, it was improbable that his DNA could match theirs.

A C.S. told the police that Barber sold marijuana from the residence and kept a gun under the cushions of the couch, which the C.S. had seen Barber handle on several occasions. At the time of the search, when the police asked Barber if there were any guns in the house, Barber had a visceral reaction. He became very nervous and his entire body started to shake. He started breathing heavily and started to perspire. He looked over at the couch and then immediately looked away. He then told the police that there were no firearms in the residence. Based on Barber's reaction, the police had no doubt that Barber knew that there were firearms under the couch.[110]

At the time of King's trial, Barber had already accepted a plea to probation. There was no condition of the plea that Barber testify at King's trial. The State

---

[110] June 14, 2016 Preliminary Hearing Transcript, at pg. 24.

met with Barber to discuss his trial testimony at King's trial. Barber claims that at that pretrial meeting, the State was insistent that he blame everything on King – the guns and drugs, but that Barber refused to do so. Barber told the State that he never saw King with any guns and that if called to testify at King's trial, he would testify that the guns were his.

Officer Evans was also at the meeting. In his September 4, 2024 Affidavit, he recalls that the State was insistent that Barber testify at King's trial but Barber was adamant in his refusal to do so. A State Prosecutor told Barber that despite his refusal to testify, he was going to call him as a witness. Barber said that if called to testify at King's trial, he would testify that the guns were his.

Later, in a recorded interview with the State sometime after he provided his Affidavit to King's Rule 61 counsel, Barber reiterated that at the pretrial meeting the State kept insisting that Barber blame everything on King, but that Barber refused to do so. Barber again stated that he never saw King with any weapons. This time, Barber stated that he too also never saw any weapons in the house.

The State never disclosed Barber's statements made during this pretrial meeting to King's trial counsel. The State never called Barber as a witness at trial. It is undisputed that King's trial counsel never knew that Barber, if called as a witness at trial, was going to testify that the guns were his and that he never saw King with any guns.

Even if Barber had said at the meeting, that he never saw King with any guns and he too was not aware of the existence of any guns in the house, that would still be exculpatory and impeaching. The one thing we know beyond any reasonable doubt is that **Barber** was aware of the existence of the guns under the couch.

To understand the material effect that Barber's trial testimony would have had on King's trial, you only need to review the State's closing argument at King's trial.

> [King's] business, his DNA, on June 3rd 2016, the defendant's business was running a drug house, and while doing so he possessed three firearms. 218 West 22nd Street is a drug house, plain and simple. . . I want to talk to you a little bit about Randy Barber, the other person in the house, the other person who was not bedridden in the house. His DNA is excluded from the Canik gun, his DNA is excluded from the long gun. He is found with a small amount of marijuana, he's found with one scale in his room, he's a user. . . The defendant used every part of his house and his vehicle as part of this business. . . [T]he defendant was running a marijuana sale operation to start in his room and ended in his car. You saw that he had access to three firearms in the midst of that operation.[111]

And the State's rebuttal:

> You heard the DNA expert testify that if secondary transfer were to occur, the first person's DNA would also be on that item. Randy Barber's DNA was excluded from the guns. This was not secondary transfer, this was the defendant's operation, the defendant's drugs, the defendant's guns, and the defendant's dealing.[112]

---

[111] May 11, 2017 Trial Transcript, at pgs. 7-16.
[112] May 11, 2017 Trial Transcript, at pg. 31.

As an aside, the State's arguments in its closing and rebuttal that Randy Barber's "DNA was excluded from the guns" is misleading and incorrect. Barber's DNA was excluded as a potential DNA contributor on the trigger of the Canik 9 mm gun, and both King and Barber's DNA were excluded as a potential DNA contributor on the hammer of the Canik 9 mm gun. No conclusions as to whether Barber could be included or excluded could be drawn on the slide, grip, magazine and cartridge of that gun. When there is no conclusion that can be drawn, there is not enough information to conclude whether the person is included or excluded.[113] It is therefore misleading and incorrect to state that Barber's DNA was excluded from this gun.

Likewise, no conclusions could be drawn as to the grip, slip, trigger, magazine and cartridge of the Ruger 9 mm. Barber's DNA was not excluded from this gun. There were no conclusions that could be drawn from any part of this gun.

As to the Anderson rifle, Barber was excluded as a potential contributor on the grip and trigger. No conclusions could be drawn as to whether he could be included or excluded on the slide, trigger or stock.

Turning back to the *Brady* issue, Barber's suppressed pretrial statements to the State were material and relevant to the most significant issue in the case- who owned or possessed the firearms. A *Brady* violation is shown when the suppressed

---

[113] May 10, 2017 Trial Transcript, at pg. 90-91, 97.

evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[114]

The United States Supreme Court held in *Brady v. Maryland*[115] that when the State suppresses evidence that is favorable to the accused and material to either guilt or punishment, the State violates the defendant's right to due process irrespective of good faith or bad faith of the prosecution.[116] The touchstone of due process analysis in cases alleging a *Brady* violation is the fairness of the trial, not the culpability of the prosecutor.[117]

Under *Brady* and its progeny, the prosecution in criminal proceedings has a constitutional obligation to disclose exculpatory and impeachment evidence within its possession to the defense when that evidence might be material to the outcome of the case.[118]

A *Brady* violation occurs where the State fails to disclose material evidence that is favorable to the accused, because it is either exculpatory or impeaching, causing prejudice to the defendant.[119] A new trial will be ordered when the State fails to provide the defendant with material evidence that is favorable to the accused.[120] Impeachment evidence falls within the *Brady* rule. Such evidence is

---

[114] *Kyles v. Whitley,* 115 S.Ct. 1555, 1558 (1995).
[115] 373 U.S. 83 (1963).
[116] *Brady,* 373 U.S. at 87; *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[117] *Wright v. State,* 91 A.3d 972, 993 (Del. 2014).
[118] *Ray v. State,* 280 A.3d 627, 646 (Del. 2022).
[119] *Wright v. State,* 91 A.3d 972, 977 (Del. 2014).
[120] *Atkinson v. State,* 778 A.2d 1058, 1062 (Del. 2001).

evidence favorable to the accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.[121]

The three prong test to determine whether there is a violation of the *Brady* rule includes: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence is suppressed by the State; and (3) the suppression prejudices the defendant.[122] The failure to produce evidence will not, by itself, constitute a *Brady* violation. *Brady* requires the State to provide evidence to the defendant when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[123]

It is important to emphasize that determining whether the proceeding would have been different does not require the Court to find that the defendant would have been acquitted.[124] Rather, the defendant must show that the State's evidence creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[125] A reasonable probability of a different result occurs where the government's evidentiary suppression "undermines confidence in the outcome of the trial."[126]

---

[121] *Id.*
[122] *Starling v. State,* 882 A.2d 747, 756 (Del. 2005); *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[123] *Starling,* 882 A.2d at 756.
[124] *Atkinson v. State,* 778 A.2d 1058, 1063 (Del. 2001).
[125] *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[126] *Id.*

Those accused of crimes are afforded the right to a fair trial, which is understood to mean a trial with a "verdict worthy of confidence."[127] Consequently, the burden of showing a reasonable probability of a different result only requires the defendant to show that the suppressed evidence "undermines the confidence in the outcome of the trial."[128]

In this case, all three prongs are met. First, the evidence suppressed was favorable to King, because it was either exculpatory or impeaching. Second, the evidence was suppressed by the State. Third, the suppression prejudiced the defendant.

The State argues that because Barber said that after the pretrial meeting he told King's wife that the State was trying to get him to blame everything- the guns and drugs- on King and that he was refusing to do so, King is precluded from raising this *Brady* issue at this time. However, nobody knows what was actually conveyed to King's wife by Barber. Nobody knows if, in fact, anything was conveyed to her and that, if so, whether she thereafter relayed the communication to King. King's wife is not an attorney. King's wife either was not told about Barber's exculpatory statements or failed to appreciate the significance of those statements. What is known, and undisputed, is that King's trial attorney was never made aware of Barber's expected trial testimony.

---

[127] *Atkinson v. State,* 778 A.2d 1058, 1063 (Del. 2001).
[128] *Id.*

33

When a defendant is serving a 120-year prison sentence, relief from the State's *Brady* violation should not rest on whether the witness making the exculpatory statement mentioned something about it to another layperson. The State's obligation is to advise King's trial counsel of the statements and it is undisputed that the State did not do so.

The State also claimed that it did not bring Barber's statements to King's trial attorney's attention because it believed that Barber's statements of ownership of the firearms was false, and therefore, neither favorable nor exculpatory. The State reasoned that since Barber had already pled guilty and been sentenced, he faced no legal danger by making "such a bald assertion."[129]

In order for the State to discharge its responsibility under *Brady,* the prosecutor must disclose all relevant information obtained by the police or others in the Attorney General's Office to the defense.[130] Here, Barber's statements, whether believed by the prosecution team or not, were potentially exculpatory and material.

A prudent prosecutor will resolve doubtful questions in favor of disclosure.[131] This is as it should be. Such disclosure will serve to justify trust in the prosecutor as the representative of a sovereignty whose interest in a criminal

---

[129] As to ID No. 1606002410A: D.I. 82- State's Response to Rule 61 Motion, at pg. 27.
[130] *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[131] *Kyles v. Whitley,* 115 S.Ct. 1555, 1568-1569 (1995).

prosecution is not that it shall win a case, but that justice will be done.[132]   And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.[133]

The prosecutor's job is not to be the gatekeeper and is not to make credibility decisions as to the truthfulness of the potentially exculpatory testimony of the co-defendant that go to the very heart of this case.  The prosecutor's job is to disclose this potentially exculpatory evidence to defense counsel and then let the jury do its job.

The third component- materiality does not require the defendant to show that the disclosure of the suppressed evidence would have resulted in an acquittal.[134] Evidence falls within a *Brady* violation when the evidence if disclosed and used effectively, might make the difference between conviction and acquittal.[135]   A *Brady* violation is shown when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[136] While King is not entitled to a perfect trial, he is entitled to a fair one

---

[132] *Id.*
[133] *Id.*
[134] *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[135] *Id.* at 989.
[136] *Kyles v. Whitley,* 115 S.Ct. 1555, 1558 (1995).

where material exculpatory and impeachment evidence is disclosed and not suppressed.[137]

The reviewing court may consider any adverse effects from nondisclosure that resulted on the preparation and presentation of the defendant's case.[138]

In this case, Barber's testimony, if used effectively, might have made the difference between King's conviction and acquittal. Barber's testimony that the guns were his, to be sure, does not prove King's innocence. Of course, possession of an object may be the joint possession of two or more persons acting in concert.[139] The jury could find that both Barber and King constructively possessed one, two or all three of the firearms. At 40 years imprisonment for each firearm conviction, an acquittal on any one or more of the three firearms would significantly reduce King's sentence.

In the trial, as presented, the State completely removed Barber out of the drug dealing operations and centered the trial around the theme that King was running a drug house, and Barber was a user. Drug dealers need guns for the drug dealing operation. King was the only drug dealer in the residence therefore the guns had to be his.

---

[137] See, *Wright v. State,* 91 A.3d 972, 977 (Del. 2014).
[138] *Wright v. State,* 91 A.3d 972, 987-989 (Del. 2014).
[139] *Stevenson v. State,* 2018 WL 1136524, *2 (Del. 2018); *Lecates v. State,* 987 A.2d 413, 426 (Del. 2009)(constructive possession may exist either directly or through another person).

The presentation of King's case could have been markedly different if King's trial counsel was aware that Barber would testify that he never saw King with any guns and that the guns were his (Barber's).

In the trial as presented, the jury never learned that Barber was also a drug dealer. The jury never learned of the controlled drug transaction witnessed by the police in which both King and Barber participated. The jury never learned that a C.S. identified Barber as a drug dealer selling marijuana from the residence and that Barber kept a firearm under the seat cushion of the couch which the C.S. had observed on several occasions. The jury never learned that Barber admitted to, and was convicted of, drug dealing and conspiring to drug dealing and possessing firearms on the date at issue.

Although King's trial counsel did raise Barber's visceral reaction to the police inquiry when asked whether there were any firearms in the house during the execution of the search warrant, without knowledge that Barber was also selling drugs from the house, his reaction standing alone had no context.

In this case, there was no overwhelming proof that the guns at issue were King's. There was no evidence that anybody ever saw King with any of the guns. The guns were not found in King's car, or in either of the two bedrooms he used in the residence. The only evidence linking King to the guns was the DNA test results.

If King's trial counsel had been made aware that Barber was going to testify that the guns were his and that he never saw King with the guns, trial counsel would have been able to present the jury with a viable alternative, another individual living in the house also dealing marijuana, that the guns could have belonged to. The evidence was material and relevant to the most important issue in the case, who owned or possessed the firearms.

The issue is not whether the State would have had a case to go to the jury if Barber's statements had been disclosed, but whether we can be confident that the jury's verdict would have been the same.[140] Confidence that it would have been cannot survive a recap of the suppressed evidence and its significance for the prosecution. The jury would have been entitled to find that:

- Barber was credible and truthful that the guns were his and that he never saw King with the guns.

- If Barber testified that he never saw any guns, and never saw King with any guns, the jury would in all likelihood find that Barber was not telling the truth about his knowledge of the guns under the couch. The jury would almost certainly conclude that the guns were Barber's. The 120-year question would become, in addition to the guns belonging to Barber, did they also belong to King.

---

[140] *Kyles v. Whitley,* 115 S.Ct. 1555, 1575 (1995).

- The State argues that Barber claimed that he would testify that the guns were "mine", but he did not say they were "all mine". But Barber also said that he never saw King with any guns. Barber claiming the guns were his and that he never saw King with any guns, infers that the guns were all Barber's. That would be the issue for the jury to resolve. The State would be able to argue to the jury that the guns were not only Barber's but also King's, and the defense would be able to argue that the guns were only Barber's.

   But this is a far different issue presented to the jury than the issue presented at trial- that King was the only drug dealer, Barber a user, and therefore, the guns had to belong to King since there was no other viable alternative. Now the jury is presented with a choice, a viable alternative.

- The jury could find that the investigation was limited to the State's uncritical readiness to believe that King was in possession of the guns that led to the disparate treatment of Barber and King in the resolution of the charges. (ie. Barber was given a plea to probation but the State sought significant jail time for King).

- The jury could reasonably find that the rifle found in King's brother's closet belonged to Barber, or to King's brother, or to someone else in the house. Again, there is now a viable alternative to the guns having to belong to King because he is the only drug dealer in the house.

Of course, the jury could also find that the guns, while Barber's, were also King's. But the issue is not whether Barber's suppressed testimony would have resulted in an acquittal. The issue is whether in light of the suppressed statements, King received a fair trial. King's potential defense was significantly impaired by the suppression of this exculpatory evidence. Since all of these possible findings were precluded by the prosecution's failure to disclose the evidence that would have supported them, "fairness" cannot be stretched to the point of calling this a fair trial.

Because the net effect of the suppressed evidence favoring King raises a reasonable probability that its disclosure to competent counsel would have made a different result reasonably probable, the conviction cannot stand, and King is entitled to a new trial.

## REMAINING ISSUES

Although it is unnecessary to address any of the other issues raised in King's Rule 61 motion, the Court would be remiss if it did not make one final observation.

As to the unloaded rifle in King's brother's bedroom, the State's drug-dealing expert, Sergeant Lloyd, testified at trial that the AM-15 long gun found in Bedroom No. 2 was "the ultimate home defense system."[141]

The State, in its closing argument, stated: "[King's] business, his DNA, on June 3rd, 2016, the defendant's business was running a drug house, and while doing so he possessed three firearms. . . . The next part of [King's] business, upstairs security, bedroom No. 2. Inside, an AM-15 long gun rifle. . . [D]rug dealing is a dangerous business, drug dealers need firearms to protect themselves and to protect their product, what better way to protect your product than having that long gun between your product and the stairs."[142]

Perhaps the AM-15 long gun rifle may be the "ultimate home defense system", if it had been loaded, or if there was ammunition stored someplace nearby. But this rifle was unloaded and there was no ammunition found anywhere in the house. This rifle was not serving as the "ultimate home defense system" on June 3, 2016.

The concept of this unloaded rifle, found in the closet of King's brother's room, with no ammunition anywhere in the house, serving as the "ultimate home

[141] May 10, 2017 Trial Transcript, at pg. 41.
[142] May 11, 2017 Trial Transcript, at pgs. 7-9.

41

defense system" is overreaching. Afterall, it really could not be used for its intended purpose. And yet King is serving a 40-year prison sentence for his convictions related to this rifle.

## CONCLUSION

Barber's statements made to the State were both favorable to King and material in that it may have affected the outcome of the trial. Because the State withheld this evidence making it unavailable for the preparation and presentation of King's case, there was a reasonable probability of a different result had the favorable evidence the State withheld been provided prior to trial.

For all of the foregoing reasons, Marzette King's Motion for Postconviction Relief should be granted, the judgment set aside, and a new trial held.

**IT IS SO RECOMMENDED.**

*/s/ Lynne M. Parker*
Commissioner Lynne M. Parker

cc:     Prothonotary
        John A. Barber, Esquire

42